Gordon J. O'BRIEN et al.,
Plaintiffs-Appellants,

v.

John R. MORIARTY et al.,
Defendants-Appellees.

No. 73-1297.

United States Court of Appeals,
First Circuit.

Argued Nov. 8, 1973.

Decided Jan. 9, 1974.

Nathan Greenberg, Boston, Mass., for plaintiffs-appellants.

Dennis J. LaCroix, Deputy Asst. Atty. Gen., with whom Robert H. Quinn, Atty. Gen., was on brief, for defendants-appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Five inmates of the Massachusetts Correctional Institution at Walpole brought suit[1] in the district court under 42 U.S.C. §§ 1983 and 1985 against the Commissioner of Corrections and other state officials. In substance they allege that they occupy individual cells 6 feet wide and 9 feet long in the prison's isolated maximum security facility; that in front of the cells is a passageway about 4 feet wide and about 120 feet

1. Plaintiffs purport to sue under F.R.Civ.P. 23 for themselves and all persons similarly situated. Jurisdiction is alleged under 28 U.S.C. §§ 1331, 1343(3) and 1343(4), and the action is further alleged to be under 28 U.S.C. §§ 2201 and 2202.

long; that for about two months prior to a prison disturbance on May 19, 1973, they were given the right to have their cells open from 8 a. m. to 10 p. m. and to fraternize with each other in the passageway; that since the disturbance, in which they took no part, the open cell policy had been discontinued; and that being locked in their cells for the entire day constitutes cruel and unusual punishment in violation of the Eighth Amendment.[2] Plaintiffs pray for an injunction restoring the open cell policy.

After visiting Block 10 at Walpole the district court held an evidentiary hearing, consolidated by stipulation with a trial on the merits, on plaintiffs' motion for preliminary injunction. F.R.Civ.P. 65(a)(2). The court took all issues under advisement, including defendants' earlier-filed motion to dismiss, and thereafter dismissed the complaint for failure to state a claim. The court appears to have considered only the facts stated in the complaint and an admission by plaintiffs' counsel that his clients were "allowed out of their cells, one at a time, for a minimum of one hour per day. During that hour they were allowed to exercise in the corridor and take a shower if they so desired."

■ The district court erred procedurally in dismissing on the pleadings. Any issues actually tried by express or implied consent at the hearing on the merits must be "treated in all respects as if they had been raised in the pleadings." F.R.Civ.P. 15. The case should have been decided on the merits; alternatively the court might have told the parties that it would treat the motion to dismiss as one for summary judgment, see F.R.Civ.P. 12(b) and 56, considering the evidence only in order to determine if there was a genuine issue of material fact.

■ It was undoubtedly better practice in this case to inquire into the facts.[3] But the court was not at liberty after the hearing to dispose of the case on the pleadings alone. Had the hearing revealed a meritorious claim, its mere omission from the complaint would not have allowed dismissal. However, we do not remand as the evidence, viewed most favorably to plaintiffs, does not reveal a claim upon which they are entitled to relief.

Block 10 is arranged in four sections.[4] The plaintiffs' section, with about 15 cells, is upstairs. Prior to March, 1973, prisoners, except for brief intervals, were locked in their cells continuously. In March, when there were only about seven or eight prisoners in plaintiffs' section, the cells there were unlocked during all or some of the day and the inmates permitted the freedom of the corridor. Several guards testified that while the cells were open prisoner morale was good; the only untoward incident was a scuffle between plaintiff O'Brien and a medic, with the purported discovery of a knife charged to O'Brien. The testimony as to how many hours of freedom were regularly granted was conflicting, and the then superintendent denied that open doors was a "policy", as opposed to an informal dispensation. Whether a "policy" or just a practice, it ceased after a serious prison disturbance on May 19, 1973, which, as all acknowledge, did not involve plaintiffs or other Block 10 prisoners. Each Block 10 inmate was thereafter allowed out of his cell for only an hour each day, but he

---

2. While plaintiffs rely primarily on the Eighth Amendment, they also refer to the First, Fifth, Sixth, Ninth, Thirteenth and Fourteenth.

3. "[A] complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." 2A Moore's Federal Practice ¶ 12.08 at pp. 2271, 2274.

4. During the relevant period Walpole, the maximum security Massachusetts state prison, was in turmoil. Early in 1973 its superintendent was replaced. A strike of guards followed. In June the state police were called in to take control of the institution temporarily; their commander became the acting superintendent. This case was heard by the district court in July, 1973, when the state police were still in control.

could speak to others during the hour from the corridor. Plaintiffs have been depressed since the open cell policy ceased, and on one occasion in June several inflicted injuries upon themselves.

Prison officials testified that since the spring of 1973 the population of the section where plaintiffs are confined doubled, while the number of guards in Block 10 decreased. Prison officials oppose an open cell policy because of the increase in Block 10 prisoners, because many are disciplinary cases, and because of danger that one prisoner may injure or murder another.

■ A punishment may be so below civilized norms as to be cruel and unusual no matter what its provocation, or it may be cruel and unusual because extremely disproportionate to the occasion. *See* Furman v. Georgia, 408 U.S. 238, 271–279, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring). Segregated confinement involving neither intolerable isolation nor inadequate food, heat, sanitation, lighting or bedding, does not fall within the former category.[5] It may be a necessary tool of prison discipline, both to punish infractions and to control and perhaps protect inmates whose presence within the general population would create unmanageable risks.

■ The record in this case does not show that plaintiffs' confinement has been accompanied by inhuman or barbarous conditions. They apparently receive the same food as others; they do not complain of the heat, sanitation, lighting or bedding; they are allowed out of their cells for an hour daily. One of the plaintiffs admitted to television and some visitation privileges. For a person to be cut off markedly from all others is a privation not to be underestimated, but the conditions here are not so severe as to be *per se* impermissible.

■■ Nonetheless a punishment not always forbidden may violate the Eighth Amendment if, in the circumstances, it is extremely disproportionate, arbitrary or unnecessary. Furman v. Georgia, *supra,* 408 U.S. at 238, 279, 92 S.Ct. 2726 (Brennan, J., concurring). Imposed inappropriately, or for too long a period, even the permissible forms of solitary confinement might violate the Eighth Amendment. Cases upholding instances of solitary confinement involve most often its imposition as a short-term punishment for disciplinary infractions.

■ Plaintiffs assert that it was arbitrary and unnecessary, once an open cell policy was adopted and was working, to revoke it. But prison administrators must have wide authority respecting measures necessary to safeguard inmates, to protect them one from the other, and to maintain security. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Facing "complicated and combustible situations each day", prison officials must be free to "make a wide range of decisions. Much must be left to their good faith discretion." Palmigiano v. Baxter, 487 F.2d 1280, at 1283 (1st Cir. 1973). The mere fact that different measures might have worked or might still be workable does not allow a federal court to substitute its judgment for that of prison officials. The decision of prison authorities, made at a time of extreme unrest and supported by other considerations, not to permit fifteen inmates to roam around at once cannot be said to be so unreasonable as to be impermissible. An open cell policy was apparently a deviation from what had been the normal practice in Block 10. Plaintiffs have never denied that the state had sufficient reason in the first place to confine them there rather than with the general population. Nor was any contention ad-

---

5. Sostre v. McGinnis, 442 F.2d 178 2d Cir. *en banc* 1971); Ford v. Board of Managers, 407 F.2d 937 (3d Cir. 1969); Novak v. Beto, 453 F.2d 661 (5th Cir. 1971). *Cf.* Rozecki v. Gaughan, 459 F.2d 6 (1st Cir. 1972).

vanced that reinstatement of the normal practice after several months invoked any procedural due process requirements.

At the hearing plaintiffs claimed to be "*protective custody*" inmates rather than "*disciplinary cases*". Judge Craven, in his dissenting opinion in Breeden v. Jackson, 457 F.2d 578, 581–582 (4th Cir. 1972), argued that the state, which has a duty to protect inmates, may not condition that duty on an inmate's acceptance of the same burden, i. e. solitary confinement, imposed as punishment in disciplinary cases. In other words, he proposes that something less onerous than solitary confinement must be provided for individuals who must be protected from the general population.[6] *But see* Smith v. Swenson, 333 F.Supp. 1253 (W.D.Mo.1971).

However, there is no occasion for us to pass upon that issue here, and we do not do so. The record does not adequately reveal why plaintiffs were in Block 10. It was not shown that they were in Block 10 solely for reasons of their own safety. While the protective custody category might include, for example, one who had turned state's witness it might also include a hardened offender who was highly disruptive or an individual lacking in sufficient self-control to mix safely with others. The associate superintendent of Walpole testified that plaintiffs were security risks, assaultive to others and the staff.[7] He and the state police colonel in temporary charge of Walpole also testified that it would be dangerous—involving the "risk of murder or of death to one of the plaintiffs"—to permit them to leave their cells and mingle with others.[8] Finally, it is not clear if the intermixing

of categories of prisoners in Block 10 was a temporary expedient resulting from the crisis at the institution, or was to continue indefinitely.

On the evidence presented, the district court would have had no basis upon which to consider whether the plaintiffs' present treatment was so unreasonably disproportionate as to be cruel and unusual.

Affirmed.

---

6. What that may be is not so easily determined. The two senior Walpole officials who testified thought that protective custody prisoners might best be sent to another institution, rather than being intermingled in Block 10 with disciplinary cases. What different arrangements for their safekeeping, if any, would be in order elsewhere were not considered.

7. Two of the plaintiffs were said to have "been reported for assaulting officers." One

was said to be serving a sentence for having taken officers hostage and threatening to kill them.

8. That this may not be sheer romance is suggested by recent newspaper reports that in 1973 Walpole led the nation in the rate of inmate murders, a rate of 8.9 murders per 1,000 population being reported for the first eleven months. The Boston Globe, November 30, 1973.