Anthony JACKSON, Plaintiff, Appellee,

v.

Larry MEACHUM, et al., Defendants, Appellants.

Anthony JACKSON, Plaintiff, Appellant,

v.

Larry MEACHUM, et al., Defendants, Appellees.

Nos. 82–1455, 82–1464.

United States Court of Appeals, First Circuit.

Argued Oct. 8, 1982.

Decided Feb. 10, 1983.

Rehearing Denied March 16, 1983.

John W. Bishop, Jr., Sp. Asst. Atty. Gen., Beacon, Mass., with whom Kim E. Murdock, Boston, Mass., was on brief, for Larry Meachum, et al.

Roderick MacLeish, Jr., Boston, Mass., with whom Fine & Ambrogne, Boston, Mass., was on brief, for Anthony Jackson.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

In these cross-appeals, the Commonwealth of Massachusetts challenges the ruling of the district court that plaintiff, a multi-life sentence inmate of the Admissions Unit of Bridgewater State Hospital, confined largely to his cell, be permitted contact and communication with other inmates for not less than three hours each day. Plaintiff appeals from the court's rulings refusing to enjoin his continued confinement in the Admissions Unit by reason of alleged procedural defects prior to his transfer, rejecting his claim that his transfer to the Unit was in retaliation for his litigation efforts under his First, Sixth, and Fourteenth Amendment rights, and rejecting his claim that his incarceration violated his right to treatment.

The plaintiff, Anthony Jackson, is a state prisoner with a highly unusual sentence structure including a 15–20 year sentence for armed assault with intent to murder, three consecutive life sentences for first degree murder, and two 20–30 year sentences for rape and unarmed robbery. He is not only classified a maximum security prisoner, but the likelihood of his discharge from prison is concededly most remote. The defendants are the Massachusetts Commissioner of Corrections, Michael Fair, and Charles Gaughan, Superintendent of Bridgewater State Hospital, a correctional facility for the care of the mentally ill.

Plaintiff's recent incarceration history began with his arrival in 1976 at the Massachusetts Correctional Institution at Walpole, where he was assaulted and injured by other inmates very shortly after arrival. He was then lodged with the general population of the Max I unit at Bridgewater State Hospital. Here he stayed during the remainder of 1976 and much of 1977. He then was transferred to the Southeastern Correctional Center, a medium security prison, where he remained until 1981. His record at both facilities was free of any incidents of disruption or attempts to escape.

It was the proposal that he be transferred back to Walpole that led to the litigation raising the issues in these appeals. Plaintiff strongly resisted this move, became depressed and suicidal, partly at least from fear of more assaults, and was transferred to Bridgewater State Hospital on July 29, 1981 for psychiatric observation. After three days of evaluation in the Admissions Unit, he was assigned once again to Max I. On September 11, 1981, however, he was returned to the Admissions Unit, and the conditions of custody of which he now complains, by order of Superintendent Gaughan, with the approval of Commissioner Fair.[1]

The order had been preceded by a meeting in July between a clinical psychologist and the Commissioner in which plaintiff's situation was reviewed. The psychologist had described plaintiff as suicidal. The Commissioner knew of plaintiff's convictions for motiveless killings, his consecutive sentence structure, the likelihood that he would die in prison, and his other past acts of violence in assaulting a girl friend and two corrections officers at different prisons, and was of the opinion that plaintiff could scale the two fences surrounding the hospital in six to ten seconds.

The clinical psychiatrist had also given his report as to suicidal tendencies to Superintendent Gaughan, who, now facing the likelihood that plaintiff would be a long-

---

1. Since the hearing in the district court on June 17, 1982, plaintiff, after a suicide threat, was transferred to a "close observation" unit of the hospital for observation and evaluation; the unit provides a large open room in which up to 20 inmates, many being suicide risks, may mingle under the surveillance of guards. There, as of the time of oral argument, he remained and was reported to be content with the conditions of his custody. But it is the intention of defendants to return plaintiff to the Admissions Unit after observation and evaluation are completed.

time resident of the hospital, was concerned about three factors: the danger of suicide, the danger to plaintiff from inmates in the general population, and the danger of escape because of plaintiff's considerable physical prowess, combined with the fact that he would have little to lose, this danger also including the danger to society if he should escape. The superintendent at the Southeastern Correctional Center had corroborated the judgment that plaintiff was an escape risk. The Superintendent was also conscious of the kind of "media event" that any escape by plaintiff would create.

After ordering the transfer, the superintendent met with ten or a dozen corrections officers, two doctors, and a top assistant. No one disputed the transfer. The deputy medical director, Dr. Fein, concluded that plaintiff's condition would not be more likely to deteriorate if he were in the Admissions Unit than elsewhere and thus did not oppose the Superintendent's order.

The Admissions Unit, where plaintiff was confined from September 11, 1981 to June 17, 1982, is the most secure housing unit at the hospital. It consists of twenty rooms along an L-shaped corridor, a station for nurses and staff, and a "day room" (serving also as an examination, interview, or visiting room), enclosing a courtyard exercise area. Two kinds of patients reside here: the new arrivals stay a few days for evaluation, and the remaining inhabitants constitute a seclusion unit for patients who are suicidal, disruptive or violent, escape risks, or in protective custody. The building is, as the court found after a view, "clean, neat, light, and airy".

The physical circumstances of plaintiff's confinement are more particularly described as follows: his cell, at the end of the corridor, has a window overlooking the outdoor courtyard, an observation window, and a slot in the door for food, mail, or conversation with his therapist and others; inside the cell are a bed, desk, chair, television set, radio, hot plate and coffee pot, electric typewriter, toilet, sink, and trunk. The cell is clean, well ventilated and well lit.

Plaintiff's leeways and constraints are the following. He may have an hour of solitary exercise each day, although he has refused on many days.[2] He may go to the law library from 11 a.m. to 1 p.m. Except for the librarian, he works alone. He occasionally has conversed for not over two minutes with an inmate, a "ward worker", from another part of the hospital who has come on a cleaning detail. While he is permitted to talk to someone in the next cell or across the hall, the district court observed that it was very difficult to be heard or hear when the slot in the door was shut. Corrections officers have varying access to plaintiff, and vice versa, depending on the intensity of their monitoring.

As for visitors, plaintiff asserted that, since only fifteen minutes were allowed for visitors, and since his visitors had to make a two-hour trip each way, he had discouraged all visitors after the first one. At oral argument we were told that visitors could visit for four hours a day, seven days a week. Ward workers, other inmates, give plaintiff food and accompany him to his twice-weekly shower. Plaintiff's main contact with another human being, in itself rather exceptional in the Admissions Unit, is a rather extended "visit" with a psychiatrist four days a week. Dr. Lowe, the psychiatrist, communicates with and listens to plaintiff through the slot in the door. There is also some contact, not further described, with plaintiff's social worker.

Much testimony was heard on plaintiff's mental and emotional state from living under these conditions.[3] Dr. Lowe, the psychi-

---

2. Plaintiff's diary notes, for example, that he refused exercise on most of the days in October 1981.

3. Seldom, it must be, that an individual's psyche has received more scrutiny than that of plaintiff in this case. The district judge proved to be a paragon of patience. Not only did the plaintiff and his therapist testify, but witnesses from every level and relevant specialty also testified: the Commissioner, the Superintendent, the Department Head, the Deputy Medical Director, the clinical psychologist, the senior corrections officer, the corrections officer of Max I, the Assistant Deputy of the Addiction Center, another corrections officer,

atrist regularly assigned to plaintiff, gave her view that continued confinement under the above conditions would produce, as it had produced, an imminent risk of suicide. All other witnesses testified that plaintiff was obviously a suicide risk. But the question was only when, not where. They concluded that a particular place or condition would not be determinative. They also concluded that plaintiff was depressed, but not imminently suicidal.

The district court, after reviewing the evidence, evidenced its concern with the lack of almost any interaction between plaintiff and other inmates—in eating, exercising, or conversations. It also was disturbed that plaintiff had no prospect of an end to his confinement; there was no control or check over the length of his stay. The court did not attempt to resolve the dispute among the experts as to whether plaintiff was merely depressed or so depressed that he was in imminent danger of suicide. It merely found that his confinement, solitary meals, solitary exercise, and solitary library privileges "have caused him to become depressed."

The district court accepted as reasonable the decision of defendants to transfer plaintiff to the Admissions Unit for security reasons, and confirmed his continued housing there. But, putting together its concern that plaintiff had no way to demonstrate his qualification to "graduate" from his present confinement other than to become a "burnt out schizophrenic" and its view that denial of "contact with other inmates, participation in any group activities, and the possibility of earning some privileges . . . violates current concepts of human decency", district court required three hours' daily contact with other inmates.

Defendant's Appeal: Validity of Order Requiring Three Hours' Daily Contact With Other Inmates

■ The district court was obviously sensitive to the security decision of defendants when it refused to set aside plaintiff's lodgement in the Admissions Unit, and recognized that unit as the most secure facility within the hospital. It also deliberately refrained from passing judgment as to the degree of plaintiff's depression. But, concluding that plaintiff was depressed, that this depression was the product of the solitariness of his regimen, that some kind of interaction with fellow inmates was commanded by current concepts of human decency, it issued its order for three hours' daily contact with other inmates at the Admissions Unit, the library, Max I, or in some other place or manner, and further ordered defendants to submit an appropriate plan of implementation.

The question posed, therefore, is whether very extended, indefinite segregated confinement in a facility that provides satisfactory shelter, clothing, food, exercise, sanitation, lighting, heat, bedding, medical and psychiatric attention, and personal safety, but virtually no communication or association with fellow inmates, which confinement results in some degree of depression, constitutes such cruel and unusual treatment, violative of the Eighth and Fourteenth Amendments, that prison authorities can be required to provide several hours' daily interaction with other inmates. We conclude on this record that it does not.

Our survey of the applicable precedents reveals, at the highest level, cases generally characterizing what can be considered cruel and unusual punishment, but not specifically involving deprivation of human association and its resultant effects on a prison inmate's psychiatric state. *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), makes clear that discomfort compelled by conditions of confinement, without more, does not violate the Eighth Amendment, *id.* at 349, 101 S.Ct. at 2400; that wanton, unnecessary, or grossly disproportionate imposition of restraints does violate the amendment, *id.* at 346, 101 S.Ct. at 2398, as does a serious deprivation

---

and a doctor engaging in psychological evaluation. To add to the emphasis, the examination of witnesses—there was modest cross-examination—took substantial parts of nine days and produced nearly 900 pages of transcript.

of basic human needs, viewed under current standards defining "the minimal civilized measure of life's necessities". *Id.* at 347, 101 S.Ct. at 2399. *Rhodes,* however, was dealing not with human isolation but with its obverse, double-celling, and a record in which there was no evidence of serious harm suffered. *Id.* at 368, 101 S.Ct. at 2410 (Brennan, J., concurring). *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), adds the formulation that "deliberate indifference to the serious medical needs of a prisoner" also constitutes unnecessary and wanton conduct. Like *Rhodes,* however, *Estelle* did not speak to an inmate's mental or emotional health needs.

For precedent directly implicating the deprivation of contact with other inmates, but not involving the traditional physical deprivations of "solitary" (such as absolute denial of all human contact, light, food, clothing, exercise, etc.), we look to the federal courts of appeal. Perhaps the leading early case was *Sostre v. McGinnis,* 442 F.2d 178 (2d Cir.1971), in which the Second Circuit, over a vigorous dissent by Judge Feinberg, held that even long continued segregation, without additional deprivations, did not constitute cruel and unusual punishment. *Id.* at 193. In that case one hour of exercise with other inmates was permitted each day, but the prisoner refused this privilege since it involved a strip search. *Id.* at 186. In our own decision in *O'Brien v. Moriarty,* 489 F.2d 941, 944 (1st Cir.1974), we commented on a prison situation in which, after a disturbance, inmates who formerly had open cells from 8 a.m. to 10 p.m. were confined in their cells except for one hour a day: "Segregated confinement involving neither intolerable isolation nor inadequate food, heat, sanitation, lighting or bedding, does not fall within the . . . category" of conduct so below civilized norms as to be cruel and unusual punishment no matter what its provocation. We added, by way of dictum, that "even the permissible forms of solitary confinement might violate the Eighth Amendment" if "[i]mposed inappropriately, or for too long a period", *id.* at 944.

*O'Brien* was followed by *Sweet v. South Carolina Dept. of Corrections,* 529 F.2d 854 (4th Cir.1975), an appeal by a prisoner who had been confined for five years in segregation for his own safety and who sought, inter alia, more opportunities for exercise, work, and "other inmates to converse with", *id.* at 859. The Fourth Circuit opinion summarized the relevant law as follows:

"But specifically, 'isolation from companionship', 'restriction on intellectual stimulation and prolonged inactivity', inescapable accompaniments of segregated confinement, will not render segregated confinement unconstitutional absent other illegitimate deprivations. [footnote omitted] Nor will the fact that the segregated confinement is prolonged and indefinite be sufficient in itself to command constitutional protection, though it is a factor to be considered [footnote omitted], especially if the confinement is punitive rather than administrative or protective." *Id.* at 861.

Judges Butzner, Winter, and Craven in dissent deemed indefinite solitary confinement for victims of threats tantamount to punishment and disproportionate measured by the prison's own standards. They would have required the warden to submit a plan for more sensitive handling of the prisoner and, that unavailing, would have authorized the district court to obtain a report from a consultant as to what changes in the conditions of confinement were feasible. *Id.* at 869.

Two years later, the Fifth Circuit, in *Newman v. Alabama,* 559 F.2d 283, 291 (5th Cir.1977), specifically addressed the factor of psychiatric deterioration brought on by conditions of confinement:

"The mental, physical, and emotional status of individuals, whether in or out of custody, do deteriorate and there is no power on earth to prevent it. . . . We decline to enter this uncharted bog. If the State furnishes its prisoners with reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety, so as to avoid the imposition of cruel and unusual punishment, that ends

its obligations under Amendment Eight. The Constitution does not require that prisoners, as individuals or as a group, be provided with any and every amenity which some person may think is needed to avoid mental, physical, and emotional deterioration."

In 1980 two other circuits spoke. In *Bono v. Saxbe,* 620 F.2d 609, 614 (7th Cir.1980), the Seventh Circuit declared:

"Inactivity, lack of companionship and a low level of intellectual stimulation do not constitute cruel and unusual punishment even if they continue for an indefinite period of time, although the duration 'is a factor to be considered, especially if the confinement is punitive.' *Sweet, supra,* 529 F.2d 854, 861. Expert testimony that such segregation could cause psychological harm is not determinative." [4]

In *Ramos v. Lamm,* 639 F.2d 559 (10th Cir.1980), the Tenth Circuit clarified its prior pronouncement in *Battle v. Anderson,* 564 F.2d 388, 403 (10th Cir.1977), that a prisoner was "entitled to an environment which does not result in degeneration or which threatens his mental and physical well being", by stating that the district court had correctly found violations in the "core" areas of shelter, sanitation, personal safety, and medical care, and that any shortcomings in "motility, classification, and idleness" would not be of constitutional dimension. 639 F.2d at 566–67. The court specifically stated that it had no quarrel with *Newman v. Alabama, supra. Id.* at 566.

The latest contribution to this catalogue, so far as we know, is *Gibson v. Lynch,* 652 F.2d 348 (3d Cir.1981), in which a prisoner had been held in a "housing hold" status for three months in an isolation cell, with no radio, TV, yard recreation, or contact visits. The court observed that "given the adequate attention to Gibson's nutritional and

other needs, his confinement for more than 30 days in isolation cannot be considered to trench upon his eighth amendment rights." *Id.* at 352. It cited *Hutto v. Finney,* 437 U.S. 678, 687, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978), for the proposition that length of time in isolation was "simply one consideration among many."

This review of federal appellate decisions during the past decade which have focused on the factor of segregated confinement and lack of inmate contact reveals to us a widely shared disinclination to declare even very lengthy periods of segregated confinement beyond the pale of minimally civilized conduct on the part of prison authorities. Those courts which have had occasion also to deal with claims of psychological deterioration caused by confinement have rejected these claims. The several dissents, although they may be prophetic, have not carried the day. Nor have we seen any case where partial relief of the nature ordered here was upheld.

We do not suggest that the district court's prescription of several hours of inmate contact a day is a mere "amenity", to use the language of *Newman.* It might very well be helpful therapy. But to accept plaintiff's proposition that there is a constitutional right to preventive therapy where psychological deterioration threatens, notwithstanding that the physical conditions of confinement clearly meet or exceed minimal standards, would make the Eighth Amendment a guarantor of a prison inmate's prior mental health. Such a view, however civilized, would go measurably beyond what today would generally be deemed "cruel and unusual".

We conclude that the confinement which has taken place in this case has not been wanton, unnecessary, or disproportionate and that there has been no "deliberate indifference" to the mental health needs of

---

4. In an earlier decision, *Chapman v. Pickett,* 586 F.2d 22, 28 (7th Cir.1978), the court had declared that a lengthy and indeterminate segregated confinement precluding exercise, work or vocational training, and "lack of society with other inmates or family and friends" constituted "a list of conditions" which had been held

sufficient to support a claim for damages in *Buise v. Hudkins,* 584 F.2d 223 (7th Cir.1978). *Buise,* however, contains no reference to any such identifiable list, but dealt with a "writ writing" prisoner who complained of his retaliatory transfer from the state farm to state prison.

plaintiff. We hold that on this record the district court erred in requiring the defendants to arrange for petitioner to have contact with other inmates for three hours a day.

Perhaps this is all we should say on this issue, since plaintiff is presently, so far as we have been told, under a less restricted regimen, being in a "close observation" unit with substantial opportunity to be in the company of other inmates. But, in light of plaintiff's prospect of lifelong incarceration, the problem of a long continued segregated confinement will not go away. We therefore add some observations by way of indicating that, notwithstanding the deference accorded to prison authorities for their decision to impose the restraints here described, they are not entirely free from review.

In the first place the indefiniteness of segregated confinement generates, with the lapse of time, either a requirement of due process or a procedural requirement activated by the Eighth Amendment [5]—a need for systematic, periodic review of the prisoner's condition, his ability to reenter the general population, and the feasibility of providing means of lessening the rigors of his segregation. Although the Supreme Court in *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) rejected the idea that prolonged isolation was in itself cruel and unusual punishment, it recognized that length of isolation was a factor. *Id.* at 686, 98 S.Ct. at 2571. *Cf. Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) (indefinite custody, without hearing, of person civilly committed for inability to stand trial violates due process).

In *Kelly v. Brewer,* 525 F.2d 394 (8th Cir.1975), the court held that if an inmate were held in segregated confinement indefinitely or for a prolonged time, "due process requires periodic review in a meaningful way and by relevant standards to determine whether he should be retained in segregation or returned to population". *Id.* at 400. In *Bono v. Saxbe, supra,* 620 F.2d at 614, the court held that since the district court had ordered periodic review, indefinite confinement did not constitute cruel and unusual punishment. And in *Gibson v. Lynch, supra,* 652 F.2d at 348, the court observed that if a prisoner is a severe risk case, due process requires periodic review.

We therefore conclude that if plaintiff is returned to a more restrictive confinement, approaching his restrictions in the Admissions Unit, with the intention that such confinement would be either prolonged or indefinite, defendants should, thereafter if not before, devise a system of periodic review incorporating such criteria and procedures as may be suitable to determine the feasibility of release to the general population or other ameliorative actions.

We think it useful to make an observation bearing on substance in addition to that concerning the need for periodic review, even though it might be characterized as dictum. Although the current state of the law seems to be that prolonged length or indefiniteness of segregated confinement does not violate the Eighth Amendment, at least so long as periodic review is provided, periodic review does not end the proper concern of prison authorities. In *Rhodes v. Chapman, supra,* the majority observed that there had been no evidence that the double-celling there involved had inflicted unnecessary or wanton pain, *id.* at 348, 101 S.Ct. at 2399. Justice Brennan, speaking for the three concurring Justices, found crucial the fact that the district court could not identify any actual "serious" harm. *Id.* at 367–68, 101 S.Ct. at 2409–10. Although depression, hopelessness, frustration, and other such psychological states may well prove to be inevitable byproducts of lifelong incarceration, the threat of substantial, serious

---

5. Some notion of periodic review as a procedural check on Eighth Amendment constraints seems implicit in the Supreme Court's injunction in *Rhodes, supra,* 452 U.S. at 346, 101 S.Ct. at 2398, that punishment not be inflicted without penological justification: though segregated confinement be justified at the outset, the conditions that gave rise to its justification may, over time, disappear. Plaintiff may, for instance, become physically debilitated and pose less of a security risk, or the security of the hospital perimeter itself may be strengthened.

and possibly irreversible if not critical psychological illness together with prolonged or indefinite segregated confinement would increase the burden on prison authorities to explore feasible alternative custodial arrangements.

Plaintiff's Appeal: Due Process, Retaliation, Right to Treatment

Plaintiff in his appeal complains first of the district court's refusal to find that he had a right to notice and hearing prior to his transfer to the Admissions Unit. Although *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), constitutes a formidable initial barrier, he seeks to establish a justifiable expectation in such procedural safeguards by invoking regulations addressed to formal segregation (not applicable to his status in the Admissions Unit), to seclusion (a regulation applicable only to the Department of Mental Health), and isolation. The last status was not alleged in plaintiff's amended complaint, is imposed as discipline, not security, and, as the district court found, differs in several respects from segregation. We have already manifested our concern over the need for periodic review in the event of a prolonged stay in the Admissions Unit, but reject the suggestion that the conditions of isolation and those of plaintiff's confinement were so similar as to require notice and hearing prior to transfer.

Plaintiff makes two other arguments to support his procedural due process claim. One is based on Massachusetts General Laws ch. 125 § 18, which provides that the Bridgewater Medical Director "shall have the care of the inmates thereof and govern them in accordance with rules and regulations approved by the commissioner." Plaintiff argues that, because such regulations were not promulgated, and because the legislature must have intended such regulations to cover the placement of people such as plaintiff under the conditions that were imposed, he had a sufficient expectation that his transfer would be subject to regulations providing procedural safeguards. This is an ingenious argument, deriving reliance on regulations from their absence, and from an underlying general and permissive statute, insofar as the Com-

missioner is involved. We decline to make the invited leaps of inference. Finally, plaintiff makes an internally inconsistent argument that, because his protracted confinement generated a constitutionally protected liberty interest, he was entitled to notice and hearing prior to his transfer ... and prior, of course, to the rise of any liberty interest springing from protracted confinement. In short, we find no error in the district court's refusal to find violations of constitutionally mandated procedures.

Plaintiff's second basis for appeal is that the district court did not find that his transfer was effected in retaliation for his frequent resort to litigation. We have reviewed the record carefully, and conclude that the finding of the court was clearly supported.

Plaintiff's final basis for his appeal is that, to quote his brief, "he was entitled to be confined under circumstances which would not cause a degeneration in his mental and physical condition." We have already considered this contention in connection with our discussion of his "cruel and unusual punishment" claim. There was no error in the court's rejection of this claim.

*Affirmed in No. 82–1464; reversed in No. 82–1455 and remanded with instructions to enter judgment for defendants.*