**Michael LEACOCK, Plaintiff,**

v.

**Larry DUBOIS, Commissioner; Michael Maloney, Deputy Commissioner; Peter Pepe, Superintendent, MCI–Norfolk; and Mary Flynn, Reporting Officer, MCI–Norfolk, all Employees of the Department of Corrections, Defendants.**

**Civil Action No. 93–12236–GAO.**

United States District Court,
D. Massachusetts.

June 17, 1997.

---

Robert F. Schwartz, Hill & Barlow, Boston, MA, for plaintiff.

Michael Leacock, South Walpole, MA, pro se.

Ann M. McCarthy, Mass. Dept. of Corrections, Boston, MA, for defendants.

## MEMORANDUM AND ORDER

O'TOOLE, District Judge.

Michael Leacock ("Leacock") is a prisoner in the custody of the Massachusetts Department of Corrections in the Department Disciplinary Unit (the "DDU"). Leacock brought

this action to challenge the conditions of his confinement. He contends that his past and present confinement in the DDU constitutes cruel and unusual punishment in violation of the United States and Massachusetts Constitutions (Counts I and II) and violates various provisions of Massachusetts General Laws (Counts III–V). Further, he contends that while incarcerated he has been unlawfully denied educational materials (Counts VI and VII), daily exercise (Count VIII), and access to the courts (Counts IX–XI). The defendants have now moved for summary judgment on all counts.

## Background

From the record it appears that the following facts are not subject to genuine dispute.

The plaintiff is an inmate in the DDU, a separate building at the Massachusetts Corrections Institute–Cedar Junction.[1] Leacock was sentenced to the DDU for two years after being found guilty in an administrative disciplinary hearing of throwing boiling water on another prisoner and beating him. The attack caused substantial injuries to the other prisoner.

The DDU is designed to provide a restrictive environment to punish prisoners who commit serious breaches of discipline while in the general prison population. It is also intended to deter future disciplinary violations.

The DDU consists of 124 individual cells. Each prisoner is housed in a separate cell measuring eighty-four square feet. It has a toilet, sink, bed, and desk with attached seat. There is a rectangular window at the rear of each cell, approximately 5.5" × 57.5", which allows natural sunlight to enter. The door to each cell has a rectangular window approximately 4" × 26" and has two slots, one of which is used to serve food.

Each inmate may have a maximum of four books, in addition to a holy book and a dictionary, in his cell at any one time. An inmate may exchange a book he has borrowed for another book from the general reading bookcart. DDU inmates also may order books from publishers and send books they have finished reading to persons outside the institution. No inmate is allowed to participate in rehabilitative or educational programs. The prison authorities state that this restriction has a two-fold purpose: to punish the inmate for the disciplinary violation and to maintain safety of others because the educational programs are conducted in groups.

The DDU prisoners have access to a health services unit, physicians, and nurses. The inmate has the opportunity to speak with medical staff during twice-daily rounds. Further, the inmate has the opportunity to speak with mental health staff during weekly rounds and to receive mental health treatment as necessary.

In the DDU, the prisoners' privileges are severely restricted at first and then expanded gradually. For example, during the first thirty days in the DDU, the prisoner is not permitted to have a television or a radio, or any visitation or telephone privileges. After thirty days without a further disciplinary violation, the prisoner is issued a radio, allowed one telephone call, and one in-person visit, for the next thirty-day period. The system provides similar incentives for the next ninety days.[2] The prisoners are given one hour of exercise five days a week, subject only to safety or security concerns.[3]

## Discussion

■ The defendants have moved for summary judgment on all counts. The plaintiff contends that there are factual issues that

1. Leacock completed the disciplinary sentence that he was serving when he filed his complaint, but he has since been returned to the DDU for other violations.

2. After sixty days without a violation, the prisoner is issued a television, allowed two telephone calls, and two visiting periods over the next thirty days. After ninety days without a violation, the prisoner is allowed three telephone calls, and

three visiting periods over the next thirty days. Finally, after one hundred-twenty days without a violation, the prisoner is allowed four telephone calls and four visiting periods over the next thirty days.

3. Leacock was never permitted more than four visits per month, and was only permitted contact visits with his attorney. He was limited to four books in his cell at any one time.

can only be resolved at trial.[4] For the following reasons, the defendants' motion for summary judgment is granted on all counts.[5]

## I. *Cruel and unusual punishment.* (Counts I and II)

■ Leacock contends that his incarceration constitutes cruel and unusual punishment because it runs the substantial risk of causing him mental or psychological harm. He argues that his interaction with DDU staff is minimal and his privileges are arbitrarily revoked. He also argues that he is arbitrarily denied exercise and is confined to a small area for long periods of time without any human contact.

■ Leacock must fulfill two requirements to prove that the conditions of his confinement constitute cruel and unusual punishment. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). First, he must show that he has been subjected to a "sufficiently serious" deprivation of one of life's necessities. *Id.* Second, he must prove that the prison officials' state of mind was one of "deliberate indifference" to his health. *Id.*

In *Jackson v. Meachum,* 699 F.2d 578, 581 (1st Cir.1983), the First Circuit confronted the issue whether "very extended, indefinite segregated confinement" in a facility that is otherwise adequate constitutes cruel and unusual punishment. The Court concluded that segregated confinement and lack of contact with other inmates do not, without more, constitute cruel and unusual punishment. The incarceration in *Jackson,* which consisted of more prolonged and solitary confinement than is at issue here, was found not to be beyond the pale of minimally civilized conduct. *Id.* at 583.

Leacock generally has daily exercise, which allows for interaction with other prisoners; has the ability to earn telephone privileges and in-person visits; has access to mental health care; and has social interaction in an environment which must be restricted. Most importantly, the plaintiff's stay in the DDU is only for a defined period.[6] All these restrictions must be balanced against the fact that the DDU houses prisoners who have had disciplinary problems in the general prison population and have deserved their placement in a restrictive environment.

■ Leacock has not alleged any facts that could lead a reasonable factfinder to conclude that his mental health needs have been ignored or that the DDU's conditions will cause him "serious mental problems." He advances general and conclusory suppositions about the possible harm that confinement in the DDU might inflict upon an inmate. In this regard, his expert presents an analysis of the mental health problems that *may* arise from DDU confinement, but no evidence is offered to show that Leacock himself has experienced or will suffer in the future a serious adverse health consequence

4. Summary judgment is appropriate whenever "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Moreover, summary judgment may be appropriate even in cases where elusive concepts such as motive or intent are at issue, ... if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Woods v. Friction Materials, Inc.,* 30 F.3d 255, 259 (1st Cir.1994) (quoting *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993)) (internal quotations omitted). Yet, the Court "view[s] the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barb-*

*our v. Dynamics Research Corp.,* 63 F.3d 32, 36 (1st Cir.1995).

5. The plaintiffs do not oppose summary judgment as to Count IV (Mass.Gen.L. ch. 127, § 39); Count V (Mass.Gen.L. ch. 127, §§ 32, 39); Count VIII (105 CMR 451.212, ); Count IX (Denial of Access to the Courts under the United States Constitution); Count X (Denial of Access to the Courts under the Massachusetts Constitution); and Count XI (Mass.Gen.L. ch. 12, §§ 11H, 11I). Therefore, summary judgment in favor of the defendants is granted with respect to those counts without discussion.

6. The *Jackson* Court's primary concern was to prevent indeterminate stays in solitary confinement without a proper basis. *See Jackson,* 699 F.2d at 584–85.

as a result of the DDU's conditions.[7]

Leacock is admittedly more restricted in the DDU than in the general population, but his placement was deemed necessary in order to change his previously violent behavior. Federal courts "cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system: to punish justly, to deter future crime, and to return imprisoned persons to society with an improved change of being useful, law-abiding citizens." *Rhodes v. Chapman,* 452 U.S. 337, 352, 101 S.Ct. 2392, 2402 (1981). Although the rules and restrictions of the DDU may be strict, Leacock's history of disciplinary infractions itself supports the judgment that they are at times necessary.

II.  *Mass. Gen. L. ch. 127, § 40,* (Count III)

■ Leacock also contends that his incarceration in the DDU violates the limits placed upon "isolation" confinement by Mass. Gen. L. ch. 127, § 40. The defendants respond that Leacock's incarceration does not constitute "isolation" within the meaning of Mass. Gen. L. ch. 127, § 40, and it is therefore not limited by that statutory restriction.

The statute provides that a prisoner shall not be placed in an isolation unit for more than fifteen days for any one offence.[8] Inmates in an isolation unit are not permitted to have a television, radio, outside contact, or any book other than a Bible or holy book. *See MacDougall v. DuBois,* 1994 WL 879617 (Mass.Super. Ct. June 27, 1994).

By contrast, inmates in the DDU may earn television, radio and visitation privileges and may communicate with other inmates for five hours each week during exercise periods. The DDU provides light, ventilation, access to books, and after an appropriate period of good behavior, social visits and telephone calls. "Thus, it is clear that D.D.U. inmates are not subject to conditions which amount to isolation." *MacDougall,* 1994 WL 879617, at *1. Other judges of this Court have also found that the DDU does not qualify as "isolation" under § 40. *See McGuinness v. DuBois,* 891 F.Supp. 25, 28–29 (D.Mass. 1995), *aff'd,* 86 F.3d 1146 (1st Cir.1996); *Abrazinski v. DuBois,* 876 F.Supp. 313, 319 (D.Mass.1995).

III.  *Educational Materials Ban.* (Counts VI & VII)

■ Leacock contends that he has been unconstitutionally deprived of access to educational material. The Court's inquiry is limited to determining whether the "prison regulation that burdens [a] fundamental right[ ] is reasonably related to legitimate penological objectives or whether it represents an exaggerated response to those concerns." *Turner v. Safley,* 482 U.S. 78, 87, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987).

If it be assumed that access to educational materials is a fundamental right, the challenged regulation nevertheless is reasonably related to legitimate penological objectives. Withdrawing temporarily the "right" to such materials is an appropriate disciplinary tool. The imposition of the restriction may be a form of punishment for disciplinary violations; the prospect of having the restriction imposed may serve as a deterrent to future criminal misconduct. *See* Defs.' Mem. Supp. Summ. J., Ex. 3, Duval Aff. at ¶ 36. Although the efficacy of the regulation as a tool of disciplinary control can be debated, it cannot be denied that such rules are reasonably related to the prison's need to deter inmate violence and other misconduct.

*Conclusion*

For the foregoing reasons, none of the plaintiff's claims have legal merit, and the

---

7. The opinions of experts are relevant to but not determinative of the question of whether conditions meet constitutional requirements. *Rhodes v. Chapman,* 452 U.S. 337, 348 n. 13, 101 S.Ct. 2392, 2400 n. 13, 69 L.Ed.2d 59 (1981).

8. Mass. Gen. L. ch. 127, § 40 reads as follows:
   For the enforcement of discipline, an inmate in any correctional institution of the commonwealth may, at the discretion of its superintendent, be confined, for a period not to exceed fifteen days for any one offence, to an isolation unit.

   Such isolation units must provide light, ventilation and adequate sanitary facilities, may contain a minimum of furniture, and shall provide at least one full meal daily.

defendants are entitled as a matter of law to judgment dismissing all claims with prejudice.