LOVELL, et al., Plaintiffs,

v.

BRENNAN, et al., Defendants.

INMATES, et al., Plaintiffs,

v.

CONCANNON, et al., Defendants.

INMATES, et al., Plaintiffs,

v.

CONCANNON, et al., Defendants.

Civ. Nos. 79–76, P, 79–8 P and 78–90 P.

United States District Court,
D. Maine.

June 22, 1983.

R. James Davidson, Waldoboro, Me., Nat. Prison Project of the American Civil Liberties Union Foundation, Washington, D.C., Neville Woodruff, Edward Klein, Portland, Me., for plaintiffs in Civ. No. 79–76 P.

Martha E. Geores, Lewiston, Me., for plaintiffs in Civ. No. 79–8 P.

Paul G. Thibeault, Lewiston, Me., for plaintiffs in Civ. No. 78–90 P.

Gail Ogilvie, William H. Laubenstein, III, Asst. Attys. Gen., Augusta, Me., for defendants.

## OPINION AND ORDER OF THE COURT

GIGNOUX, Chief Judge.

These consolidated class actions are brought pursuant to 42 U.S.C. § 1983 by inmates at the Maine State Prison, Thomaston, Maine, (MSP), Maine's only maximum security correctional facility for men. The defendants, sued in their individual and official capacities, are the Governor of the State of Maine, the Commissioner of the Department of Mental Health and Corrections,[1] the Director of the Bureau of Correc-

---

1. Commissioner George A. Zitnay, originally named as a defendant in Civil Nos. 78–90 P and

tions,[2] and the Warden of the State Prison.[3] Three classes of inmates have been certified pursuant to Fed.R.Civ.P. 23(a) and (b)(2). The complaint in Civil No. 78–90 P was filed on May 5, 1978 and is prosecuted by all inmates of MSP who have been confined or who may be confined in Administrative Segregation at MSP. The complaint in Civil No. 79–8 P was filed on January 11, 1979 and is prosecuted by all inmates of MSP who have been confined or who may be confined in Protective Custody at the prison. The original complaint in Civil No. 79–76 P was filed on March 23, 1979, an amended complaint was filed on July 24, 1980, and the action is prosecuted by all inmates of MSP who have been confined or who may be confined in the general population at MSP. All three classes of plaintiffs allege that the conditions under which they are confined violate the Eighth and Fourteenth Amendments to the United States Constitution, as well as various provisions of State law. In addition: (1) the Administrative Segregation inmates allege that the process followed in assigning inmates to Administrative Segregation status violates the Fourteenth Amendment Due Process Clause and the provisions of a consent decree entered by this Court on January 4, 1973, in *Inmates v. Mullaney,* Civil No. 11–187, as amended by judgment entered September 27, 1977, and clarified by order entered May 10, 1978 (the 1973 Consent Decree, as amended); (2) the Protective Custody inmates challenge on Due Process grounds the policy and procedure used in granting inmates Protective Custody; (3) the Administrative Segregation and Protective Custody inmates allege that the denial of access to facilities and programs available to inmates in the general population violates the Fourteenth Amendment Equal Protection Clause and the provisions of the 1973 Consent Decree, as amended; (4) the Administrative Segregation and Protective Custody inmates allege that their Sixth Amendment right of access to the courts has been infringed; and (5) all three classes of plaintiffs contend that the use of the so-called Restraint cells in the prison's Segregation Unit violates the Eighth and Fourteenth Amendments. All classes seek declaratory and injunctive relief.[4] Jurisdiction of the claims under 42 U.S.C. § 1983 is conferred by 28 U.S.C. §§ 1343(3) and (4), 2201 and 2202; pendent jurisdiction is asserted of the State law claims. By agreement of the parties, only the liability issues presented by the actions are before the Court at this time.

The evidence before the Court is extensive. In the fall of 1979 and in early 1980, the Court held evidentiary hearings in Civil No. 78–90 P (Administrative Segregation) and Civil No. 79–8 (Protective Custody) at the prison and at Portland. On two occasions during these hearings, the Court and counsel toured the prison. Prior to final briefing, defendants instituted a lockdown at MSP in April 1980. Following that lockdown, a new warden was appointed and substantial improvements were made by the State in the physical plant, staffing and

79–8 P, and Commissioner Kevin Concannon, originally named as a defendant in Civil No. 79–76 P, have left office during the pendency of these actions. Donald L. Allen, the present Commissioner of the Department of Corrections (successor to the former Department of Mental Health and Corrections) replaces them as a defendant. *See* Fed.R.Civ.P. 25(d).

**2.** Donald L. Allen, originally named in all three actions as the defendant Director of the Bureau of Corrections, is now Commissioner of the Department of Corrections. *See* note 1, *supra.* The present position of Commissioner of Corrections incorporates the responsibilities of the former Director of Corrections. *See* Section 3 of 1981 Laws of Maine, c. 493.

**3.** Warden Richard M. Oliver, originally named as a defendant in all three actions, resigned in April 1980. Donald L. Allen served a brief period as acting warden in 1980. His successor, Paul K. Vestal, Jr., has recently resigned. The present warden, Martin A. Magnusson, remains as a defendant pursuant to Fed.R.Civ.P. 25(d).

**4.** In their complaints, the Administrative Segregation and Protective Custody inmates originally also sought compensatory and punitive damages, but these plaintiffs have not pressed or offered any evidence in support of their damage claims.

programs at the prison.[5] Plaintiffs thereupon asked to reopen the record to present further evidence, and the parties engaged in extensive discovery between April 1980 and February 1981.

In March and June/July 1981, the Court held a second round of evidentiary hearings regarding all three classes of inmates. There followed efforts to negotiate a consent disposition of the actions. These efforts were unsuccessful, and in March and April 1982 each of the parties submitted a statement of the unresolved issues. These statements indicated substantial agreement among general population and Protective Custody inmates and defendants on the adequacy of food, clothing, medical care, mental health services and visitation opportunities at the prison. Comprehensive briefs on the remaining issues were filed by the parties during the summer of 1982, and oral argument was had on October 15, 1982. On November 3, 1982, the Court and counsel again toured the prison.

The following opinion contains the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). By agreement of the parties, the findings of fact are based on the testimony and exhibits received at the 1981 hearings, a post-trial stipulation of facts filed June 17, 1982, and the Court's November 3, 1982 view of the prison.

## I.

### The Current Conditions at MSP[6]

At the outset, it must be observed that conditions at MSP as disclosed by the evidence received at the 1981 hearings and the Court's observations during its November 1982 tour of the prison differ markedly from those which were revealed by the evidence at the 1979–80 hearings and observed by the Court when it viewed the prison at that time. There is no question that substantial improvements have been made. Although the Court is satisfied that defendants have endeavored in good faith to ameliorate the conditions in which inmates are confined at MSP, it is clear that this litigation in large measure has sparked the improvements made.

### A. Facility Description

MSP was built in 1920 on a walled five-acre lot abutting upon U.S. Route 1 in Thomaston, Maine. It has an operational capacity of 402 men and was filled at or near capacity during the Court's November 1982 view. The primary living quarter for inmates is a centrally located multi-storied cell block. Adjacent to the cell block are three "open" prison dormitories and the Administrative Segregation Unit. Enclosed on the prison grounds in addition are an industries area, recreational facilities, administrative offices, maintenance facilities, an infirmary, a library, a kitchen, a bakery, a dining hall, a commissary, classrooms, counseling offices, visiting quarters, and a chapel.

### 1. Living Units

Inmates at MSP reside in single occupancy cells or in open dormitories. The prison cell block is divided into the East Wing Cell Block (East Block), the largest single housing subdivision, the Center Cell Block (Center Block), and the West Wing Cell Block (West Block). The prison open dormitories, and the Administrative Segregation Unit are located across the vehicle entrance from West Block in the "New Building."

---

**5.** On June 26, 1980, the general population plaintiffs and defendants agreed to a consent decree alleviating conditions at the prison following the April 1980 lockdown. Defendants agreed that these inmates would be permitted to eat their meals in the dining room; to have regular access to the library, canteen and religious services; to be out of their cells no less than six hours a day; to shower daily; and to obtain clean clothing. By Court order dated July 25, 1980, similar relief was granted the Administrative Segregation and Protective Custody inmates.

**6.** The Court has used the phrase "current conditions," but the conditions described are necessarily those disclosed at the 1981 evidentiary hearings and observed during the Court's November 1982 view of the prison.

*East Block*

The bulk of the inmates confined at MSP are housed in the prison's East Block. There are 210 cells in the East Block located on four tiers. Each inmate has his own cell. Guard walkways on the top three tiers are of a steel grate type, approximately two feet wide. The upper tiers are enclosed in a heavy mesh screen. Barred prisoner corridors, approximately four feet wide, run between the cells and the steel grate walkways. The cell block is of a so-called "interior design." Windows are located across the steel grate walkways from the cells, but only on the first three tiers. On each tier, one row of cells faces south onto the prison yard; the other row faces north onto Route 1. Utility corridors run behind the cells and separate each row of cells, north from south. The upper tiers in the East Block are reached by two staircases in the middle of the cell block.

Cells in the East Block measure approximately 42 square feet. Each cell contains a bed and a mattress, a folding chair, a writing table, a footlocker, a toilet which can be operated from within the cell, a wash basin with hot and cold running water, an electrical outlet, and a television cable connection. A light is located on the inside far wall of the cell and also can be operated from within the cell. There is an open shelf above the cell bars, and a small corner shelf is located next to the light fixture in each cell. The lighting within the cells is supplemented by lighting in the stairwells and by the windows opposite the first three tiers.

There are also three showers in the East Block.

*Center Block*

General population inmates are also housed in the Center Block. There are 77 cells in Center Block, located on three tiers. The cells in Center Block are similar to those in the East Block in size and appointments, except that two panels, each of seven cells, formerly used to house Protective Custody inmates, measure only about 35 square feet. Between the two levels of

these cells is a platform containing a picnic table and a shower, which serves as a dayroom for inmates confined in the 14 cells. Six cells in Center Block, directly below the former Protective Custody cells, are used as quarantine or reception cells for new arrivals at MSP and also measure only 35 square feet. The walls opposite the Center Block cells contain windows, but there are no windows opposite the top panel of former Protective Custody cells.

Each corridor in Center Block has a shower.

*West Block*

There are about 76 cells in the West Block located on four tiers. On the first floor, which is below-ground, Protective Custody inmates inhabit Cell Dormitories 5 and 6. The cells in West Block are similar to those found in the East and Center Blocks in both size and furnishings. Each cell measures about 42 square feet and contains a bunk, a commode, a wash basin with hot and cold running water, a bookshelf, a triangular shelf next to the light fixture in the rear of the cell, a writing table, a footlocker, a chair, and an electrical outlet for television and radio. The outside walls of West Block contain windows.

Each corridor in West Block contains a shower.

*Dormitories*

There are two types of dormitories at MSP: cell dormitories and open dormitories. Cell dormitories are so designated because the barred corridor which runs parallel to the cells is wide enough to allow for tables and chairs, and can serve therefore as a dayroom for the inmates. The three open dormitories, Dormitories 2, 3 and 4, consist of open rooms in which as many as 18 inmates live.[7] In the sleeping areas of the open dormitories each inmate has his own bed and a storage area for his personal belongings. Each open dormitory also has a common area in which there are chairs, tables, and a television set. Also included in each open dormitory is a bathroom area and education classes.

7. Open Dormitory 1 is used for group meetings

in which there are several toilets, wash basins, and showers.

Cell Dormitories 5 and 6 are below ground on the bottom tier of West Block. They are reserved for Protective Custody inmates. In general, the cells in the two dormitories are appointed in much the same manner as those housing general population inmates in the East and Center Blocks. The five cells in Dormitory 5, however, measure only 35 square feet each. A necessarily short corridor outside these five cells contains a shower, a table and four chairs. There are eight cells in Dormitory 6, with an approximately 8-foot wide exercise area parallel to the cells which contains chairs and tables. The bottom portions of the outer wall windows are opposite Dormitories 5 and 6.

At the far west end of the cell blocks, Open Dormitories 2 and 3 are used to house general population inmates. Dormitory 2 is approximately one-third the size of Dormitory 3. There are six inmates housed in Dormitory 2 and 15 in Dormitory 3. There are windows in Dormitories 2 and 3. Open Dormitory 4 houses 18 inmates and is set aside for Protective Custody inmates. Dormitory 4 is the largest of the three open dormitories at MSP. The Protective Custody inmates in Dormitory 4 live in an open room and share the bathroom and shower facilities located there. There are windows in Dormitory 4.

*Administrative Segregation Unit*

The Administration Segregation Unit at MSP is located west of West Block on the top floor of the New Building. It is subdivided into four areas: South side, North side, Plank side and Restraint. There are 11 South side cells, 11 North side cells, six Plank side cells, and three Restraint cells.

Cells on South and North sides are approximately 48 square feet and each has a three-foot foyer. Cells on Plank and Restraint sides are only 35 square feet. Cells on South side are adjacent to a corridor approximately 12 feet wide. Cells on North and Plank sides are adjacent to corridors approximately six and four feet wide respectively. Except for the Restraint cells, the outer walls opposite all cells in the Administrative Segregation Unit contain windows.

The appointment of the cells in the Segregation Unit at MSP is more spartan than those in the other prison cell blocks. None of the cells in the Segregation Unit have hot running water.[8] The light of each North and Plank side cell is controlled by a switch outside the cell. There are no electrical outlets in the North and Plank side cells for televisions, radios or other appliances.

The Restraint cells are located back to back with the six cells on the Plank side. A utility corridor separates the two rows of cells, and a separate corridor, 20 feet long and five feet wide, provides access to the Restraint cells. The three Restraint cells measure about 35 square feet. They are completely barren, except for a hole in the floor which serves as a toilet. The toilet can only be flushed from outside the cell. The only light is located in the foyer outside the cell. Heat is provided solely by a space heater placed outside the cell by the guards.

All four types of cells in the Segregation Unit at MSP differ from the other cells at the prison because of their "double door" construction. The inner door is of standard steel bar construction; the outer door is solid steel, with only a small aperture covered by a steel flap used for the guards' inspection. A light is located in the foyer between the inner and the outer doors.

There are showers in the North and South side corridors.

### 2. Industries and Jobs

The industries building, a multi-storied structure which houses the industries program at MSP, is located behind the main cell block, inside the walled prison compound. The program is divided in its larg-

---

**8.** During the day, hot water is available to the inmates in the Segregation Unit, upon request of the guards.

est parts into the woodshop, the print shop, the upholstery and finishing shop, and the craftroom. Most jobs within the prison industries program are performed in shifts so that one inmate works in the morning and another works the same job in the afternoon. The woodshop employs the majority of inmates who work in the prison industries program. In October 1980, there were 67 inmates who worked in the woodshop. At that time 95 inmates were employed in the four principal divisions of the industries program out of a total population of about 350.

In addition to the industries program, inmates at MSP hold a variety of other jobs maintaining or operating the prison. These jobs are described as deputies' office cleaner/runner, legal advocate, chapel clerk, block and dorm runner/cleaner, block barber, yard barbers, and jobs in the laundry, the commissary, the kitchen, education, the library, the gymnasium, maintenance, the infirmary, the radio shack, the yard, and attendance at G.E.D. classes. In October 1980, 162 inmates were employed in these jobs outside the industries program.

The crafts program at MSP is reserved for inmates who hold prison jobs or participate in the industries program. In the crafts program, inmates may use their free time to manufacture and sell novelties to the public for a profit at the prison outlet store in Thomaston. Since it is a means of earning income, the crafts program at MSP operates seven days a week and is extremely popular among inmates.

Inmates are assigned by the classification committee to a job. If an inmate performs his assigned job satisfactorily, be it in the industries program or at one of the prison-wide jobs, he is eligible for two days of extra good time per month pursuant to 17A M.R.S.A. § 1253(4).

Because they are restricted to their segregated housing areas, Protective Custody and Administrative Segregation inmates do not have access to the industries program at MSP. A limited number of cleaning and maintenance jobs are open to Protective Custody inmates in their dormitory areas.

In addition, a morning and an afternoon work crew of Protective Custody inmates are transported Monday through Friday to the minimum security prison farm unit at South Warren for work at that facility. Protective Custody inmates are allowed to manufacture crafts in their dormitories; they manufacture leatherworks and mobiles for resale at a profit to the public through the MSP showroom.

Although Administrative Segregation inmates have the opportunity to earn one day of extra good time if they complete work assignments, work assignments, such as cleaning, are in fact rarely presented to them. As a result, they cannot earn the good time credits afforded working inmates. Administrative Segregation inmates are also barred from participation in the prison crafts program.

### 3. Recreation

A variety of recreational facilities are available to general population inmates at MSP. The former quarry in the center of the prison yard has been transformed into a softball baseball field and outdoor basketball court, and is used by the inmates during the day. Approximately 50 to 75 inmates at MSP regularly participate in intramural softball. Running is also permitted inside the walls on the paved road which circles the recreation yard, although the number of runners is limited to half a dozen for security reasons. Inmates also make use of the "Monte Carlo" game room, which contains pool tables, games, cards and a television with cable television hookup. The prison auditorium (the old prison chapel), which was formerly used to show movies, is now used for games and card-playing and contains a pingpong table and a foosball table. Movies are no longer shown at MSP because the prison now provides inmates with movies on cable television. Inmates also make use of a music room located beneath the industries building. There are two weight rooms at MSP; one includes a multi-station universal machine. The old powerhouse has been converted into a gymnasium.

A corner of the prison yard roughly 50 feet by 100 feet is enclosed with a high chain-link fence topped with coiled razor wire for use by Protective Custody and Administrative Segregation inmates. The enclosed area, dubbed the "bullpen," may be used by these inmates when they are allowed to exercise out of doors. During their one hour a day of outdoor exercise Protective Custody inmates are led through a general population cell block to get out of doors, and, once out of doors, they exercise within view of other inmates. Because they are often heckled, Protective Custody inmates frequently do not exercise in the bullpen. They do not have use of the baseball diamond, the "Monte Carlo" room, the prison auditorium, the music room, the weight rooms, or the gymnasium. Protective Custody inmates may watch movies on the prison's cable television hookup, make use of chinning bars in their dormitories, and play a variety of table games in their living areas.

Since they are allowed out of their cells alone only one hour a day, and only three hours per week may be spent outdoors, Administrative Segregation inmates have little recreation. A radio has been placed at the end of the North side corridor, and the South side cells can accommodate television with cable hookup or radios.

### 4. Food Service

The prison dining hall and kitchen are located inside the prison compound behind the cell block building. Three meals a day are served to general population inmates in the dining hall. During the Court's November 1982 view, the kitchen appeared to be clean and well-equipped. Food appeared to be prepared in a healthful and sanitary manner by staff and inmate workers. The food appeared to be nutritious and the diet well-balanced. The dining hall has new stainless steel tables and chairs. The dining hall appeared to be clean and sanitary. Food is served hot to the inmates, cafeteria-style. The kitchen and dining hall are inspected by state health inspectors annually, and they have found no serious shortcomings. General population inmates may supplement their three prison meals by purchasing snacks from the prison commissary.

Protective Custody inmates are fed three meals a day in their housing units. An inmate runner, accompanied by a prison guard to prevent tampering, brings food in insulated containers from the kitchen/dining room area to the Protective Custody dormitories. The inmates serve themselves at each meal. Protective Custody inmates also have access to snacks from the prison commissary, but, unlike general population inmates who can purchase snacks directly, they must order their snacks in advance by filing canteen slips once a week.

Administrative Segregation inmates also receive their three meals a day from the dining area via inmate runners accompanied by guards. Unlike Protective Custody inmates, inmates in the Segregation Unit are served their food in their cells from trays prepared by the guards. The guards eat the same food served the inmates. Administrative Segregation inmates also have access, via weekly canteen orders, to the prison commissary.

### 5. Mental, Dental and Mental Health Services

Medical care at MSP is provided at the prison infirmary, which is located on the first floor of Center Block. Although there are eight beds in the infirmary, inmates requiring overnight treatment are sent to area hospitals. The prison medical staff includes a doctor who is present at MSP five days a week and on call after infirmary hours, assisted by five nurses. An optometrist visits MSP monthly. Dental care is provided once a week by the prison dentist and an assistant at the infirmary; in more serious cases, inmates receive dental care from outside specialists. Inmates requiring medication come to a "pill line" prior to each meal, or, if confined to their cells, have the medication delivered to their cells by a prison nurse. Prescriptions are filled by a pharmacist doing business outside the prison.

Psychiatric and psychological services at MSP are provided by a psychiatrist with an assistant, who visits the prison weekly, three full-time and one part-time psychologists, an inmate paraprofessional, three social workers and the prison chaplains. Psychological evaluations are routinely performed on all new admittees who agree to participate. Self-help groups, such as Alcoholics Anonymous, have been organized at MSP. In very serious cases, admission to the state mental health institutes is sought.

Since Protective Custody and Administrative Segregation inmates are unable to mix in the general population, a nurse visits them daily. The prison medical, dental, and psychological staff is also available to these inmates, who are either visited in their cells or are afforded guard escorts to the prison infirmary when necessary.

### 6. Educational Programs and Library

The library and classrooms at MSP are located next to the kitchen and dining hall area, behind the cell block building. Dormitory 1, in the New Building, is also used as a classroom.

The vast majority of inmates at MSP do not make use of the prison's educational offerings. On any one day, only approximately one dozen inmates actively participate in the formal educational program. The prison employs two teachers. They are assisted by two inmates who teach literacy. In addition to the prison literacy program, inmates may participate in a G.E.D. program. A college program through the University of Maine at Augusta is also offered.

The library at MSP, which includes law books, is open to general population inmates about 27½ hours a week. The Court found the library clean and adequately stocked. The law book collection was both up to date and sufficiently extensive. Legal materials not available at MSP may be borrowed from the State Law Library. A librarian is employed at the prison, and an inmate advocate is available to assist inmates in researching legal questions.

Because Protective Custody inmates are confined to their dormitories, they are not permitted to visit the library or to participate in group educational programs available to general population inmates. Their educational opportunities are limited to the G.E.D. program and the basic reading course. The college level offerings at MSP are not available to these inmates. Books are brought to Protective Custody inmates when requested, but only one book is brought at a time. The inmate advocate affiliated with the law library visits and assists Protective Custody inmates once a week.

Administrative Segregation inmates at MSP have only G.E.D. and literacy courses available to them by way of educational programming and are limited in their access to the prison library in the same manner as inmates in Protective Custody. Title 17A of the Maine Revised Statutes (the Maine Criminal Code) and a two-volume prisoner rights handbook are kept in the Segregation Unit for use by the inmates there. Other volumes must be brought to them. The inmate advocate is also available once a week to assist Administrative Segregation inmates in procuring desired volumes and in researching questions of law.

### 7. Visitation

There are nine visiting tables in the main visiting room at MSP. That room is located on the second floor over the main entrance to the prison. An annex on another level can accommodate an additional five visits, but is open only two hours a day. Use of the annex, which is both more private and more comfortable than the main visiting room, is considered a privilege by prison officials. General population inmates are limited to two visits per week: one two-hour visit on weekdays and one one-hour visit on weekends. Two-hour visits are permitted on weekends for inmates authorized to use the annex. Holding hands is permitted between inmates and their visitors, and children ages 12 and younger may sit on their fathers' laps.

Protective Custody and Administrative Segregation inmates have the same visitation privileges as general population in-

mates. They are escorted by guards through the general population to reach the visiting rooms.

### 8. Other Facilities

The prison warden and administrative offices at MSP are located in the main cell block building between the East and Center Blocks, one floor above the main visiting room and two floors above the prison front entrance and lobby.

The laundry facility at MSP, where both personal and prison issue clothing is laundered, is located directly beneath the prison kitchen in the complex of buildings behind the cell block.

Next to the laundry area are two 10-person showers. These showers are those used most often by the general population inmates. General population inmates in the East Block generally make use of these showers rather than the three showers located in their cell block.

The prison chapel is also located behind the main cell block. It is on the same floor and only a few feet from the prison library, on the other side of the kitchen and dining hall area from the laundry and showers.

### B. Daily Routine

#### 1. Inmate Schedules

Inmates schedules vary depending upon their living area. The schedule of general population inmates confined in the East Block is:

| | |
|---|---|
| 7:10 a.m. | wake up |
| 8:05 a.m. | breakfast |
| 8:30 a.m. | assignment/recreation |
| 11:25 a.m. | return to cell for count |
| 12:10 p.m. | noon meal |
| 12:35 p.m. | assignment/recreation |
| 3:25 p.m. | return to cell |
| 4:00 p.m. | evening meal |
| 4:25 p.m. | lockup |

On weekends, East Block inmates return to their cells after breakfast, are counted, and then may either go to a movie or stay in their cells. Weekend afternoons may be spent in the yard or in cells. At 3:30 p.m. they are released for the evening meal and then locked up at 4:30 p.m. East Block inmates are also allowed out of their cells three nights a week from about 5:00 p.m. to 8:30 p.m. Saturday evenings are reserved for visitation, religious activities and special events.

The schedule of general population inmates in the West and Center Blocks is:

| | |
|---|---|
| 7:10 a.m. | wake up |
| 7:30 a.m. | breakfast |
| 8:30 a.m. | assignment/recreation |
| 11:25 a.m. | return to cell for count |
| 11:40 a.m. | noon meal |
| 12:35 p.m. | assignment/recreation |
| 3:25 p.m. | return to cell for count |
| 3:40 p.m. | evening meal |
| 4:00 p.m. | lockup |

Saturdays include a movie instead of a work assignment. West and Center Block inmates are also allowed out of their cells three nights a week from 5:00 p.m. to 8:30 p.m.

The schedule of general population inmates in the open dormitories is:

| | |
|---|---|
| 8:30–11:00 a.m. | assignment |
| 11:00–11:30 a.m. | shower |
| 11:30–11:40 a.m. | return to dorm |
| 11:40 a.m.–12:05 p.m. | noon meal |
| 12:40–3:10 p.m. | recreation |
| 3:10 p.m. | dorm |
| 3:35 p.m. | evening meal |
| 4:05 p.m. | dorm |

These inmates are allowed evening activities outside of their cells three nights a week.

The schedule of Protective Custody inmates is:

| | |
|---|---|
| 7:30 a.m. | wake up |
| 8:00 a.m. | breakfast |
| 8:00–11:00 a.m. | out of cell |
| 11:00 a.m. | noon meal |
| 11:30 a.m. | lockup |
| 12:00 p.m. | out of cell |
| 3:00 p.m. | evening meal |
| 4:00 p.m. | lockup |

Protective Custody inmates may go outdoors for one hour a day in the bullpen area. They may also be out of their cells three nights a week.

Administrative Segregation inmates remain in their cells 23 hours a day.

### 2. Inmate Activities

In its broad outline, the typical day of a general population inmate at MSP consists of one half day of work and one half day of recreation. Depending upon the individual inmate's schedule, his work may be in the morning and his recreation in the afternoon, or vice versa.

Work at MSP consists of either an assignment to a shift in a shop in the industries area or an assignment to a maintenance or operations work crew.

Inmates may also choose to participate in a basic education program, a remedial reading class or a G.E.D. course, rather than a job. Inmates at MSP who take advantage of the basic educational program are eligible for good time credit, in the same manner as if they worked at a prison job.

Recreation at MSP consists of either free time spent at one of the recreation areas at the prison or participation in the prison crafts program. The craft program operates seven days per week. The craft room is available only to inmates with prison jobs. Lockers are provided for inmates in the craft program.

Protective Custody inmates do not have access to the industries program at MSP. A very limited number of cleaning and maintenance jobs are open to these inmates in their dormitories. As previously noted, Protective Custody inmates have recently been allowed to manufacture crafts in their living areas, and two small groups of Protective Custody inmates are transported to the minimum security prison farm unit for work at that facility.

### C. Classification Committee

The classification committee at MSP consists of the Deputy Warden for Care and Treatment, the Director of the Education Department, the Housing Officer, the Classification Officer, the Yard Officer and a social worker. Three members constitute a quorum. Shortly after arrival at the prison, an inmate appears before the classification committee, which then determines the inmate's security classification, housing classification, job assignment, and programming. Currently, the committee is guided by procedures set forth in a new classification manual developed in November 1980, shortly prior to the 1981 trial. Pursuant to the manual, the committee assigns the inmate a security classification of minimum, medium, or maximum, based on conformity to institutional rules, escape potential, and violence potential. At the same time, the inmate is given a housing classification of A (general population dormitories), B (Center or West Block), C (East Block), Protective Custody or Administrative Segregation. The inmate's housing assignment is determined by his security status, his institutional record, and his need for protection. He receives a copy of a written summary of his classification meetings. Each inmate is also entitled to an annual review of his classification status.

### II.

#### The Eighth and Fourteenth Amendment Claims

In addressing the issues presented by plaintiffs' Eighth and Fourteenth Amendment claims, the Court will treat separately the claims asserted by each class of plaintiffs.

### A. General Population Plaintiffs (Civil No. 79–76 P)

#### 1. The Eighth Amendment Claims

The main thrust of the Section 1983 claims of the general population plaintiffs is that defendants have subjected them to cruel and unusual punishment in violation of the Eighth Amendment, made applicable to the States by the Fourteenth Amendment. *See Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Specifically, plaintiffs allege that violence within the prison is unreasonably excessive and uncontrolled; that living and working conditions at the prison do not provide reasonable shelter, sanitation and safety; and that the lack of meaningful vocational, educational and recreational programs results in pervasive and debilitating idleness for

the prisoners.[9] While confinement at MSP may be rigorous, the Court has concluded on this record that the conditions of plaintiffs' confinement, considered separately or in combination, do not constitute cruel and unusual punishment, violative of the Eighth Amendment.

In *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), decided since the institution of this litigation, the Supreme Court considered for the first time the limitations that the Eighth Amendment's ban on inflicting cruel and unusual punishment imposes upon the conditions in which a state may confine those convicted of crimes. *Rhodes* makes clear that "the Constitution does not mandate comfortable prisons." *Id.* at 349, 101 S.Ct. at 2400. In delineating the principles relevant to assessing claims that conditions of confinement violate the Eighth Amendment, the Court in *Rhodes* announced a three-pronged test; the Eighth Amendment prohibits conditions, viewed under "the contemporary standard of decency": (1) which "involve the wanton and unnecessary infliction of pain"; (2) which are "grossly disproportionate to the severity of the crime warranting imprisonment"; or (3) which, alone or in combination, deprive inmates of "the minimal civilized measure of life's necessities." *Id.* at 347, 101 S.Ct. at 2399. *See also Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978); *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976); *Jackson v. Meachum,* 699 F.2d 578, 581–82 (1st Cir.1983); *Nadeau v. Helgemoe,* 561 F.2d 411, 413 (1st Cir. 1977). "Among 'unnecessary and wanton'

inflictions of pain are those that are 'totally without penological justification.'" *Rhodes, supra,* 452 U.S. at 346, 101 S.Ct. at 2399 (quoting *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976)); *Estelle v. Gamble, supra,* 429 U.S. at 103, 97 S.Ct. at 290. *Rhodes* further makes clear that "conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes, supra,* 452 U.S. at 347, 101 S.Ct. at 2399. Finally, the Court in *Rhodes* emphasized that courts must proceed cautiously in assessing claims that conditions of confinement violate the Eighth Amendment; they "must bear in mind that their inquiries 'spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.'" *Id.* at 351, 101 S.Ct. at 2401 (quoting *Bell v. Wolfish,* 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979)).[10]

This Court is governed by and has applied the foregoing principles most recently declared by the Supreme Court in *Rhodes* in assessing plaintiffs' claims that the conditions of their confinement at MSP violate the Eighth Amendment.

a. *Violence.* Plaintiffs' first claim is that the level of violence at MSP is unreasonably excessive. They allege that contributing to the level of violence are inadequate staffing, which is insufficient for ef-

---

**9.** By reason of the improvements which have been made during the pendency of these lawsuits, plaintiffs in their pretrial statement of issues and at oral argument have agreed on the adequacy of the food service, clothing, medical care, mental health services and visitation opportunities presently available to the general population inmates at MSP.

**10.** As the Supreme Court has repeatedly advised,

"[T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commit-

ment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism."

*Rhodes, supra,* 452 U.S. at 351 n. 16, 101 S.Ct. at 2401–2402 n. 16 (quoting *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974)). *See also Wolff v. McDonnell,* 418 U.S. 539, 561–62, 568, 94 S.Ct. 2963, 2977–2978, 2980, 41 L.Ed.2d 935 (1974).

fective control of the inmates; the design of the East Block, which has too many blind spots to permit adequate supervision of inmates; pervasive idleness among the prison population; and an ineffective classification system, which fails to separate violent inmates from nonviolent inmates.

■ There can be no dispute that prison inmates have a constitutional right to be reasonably free from violence and the threat of violence while incarcerated. *Withers v. Levine,* 615 F.2d 158, 161 (4th Cir.1980), *cert. denied,* 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980); *Woodhous v. Commonwealth of Virginia,* 487 F.2d 889, 890 (4th Cir.1973) (per curiam); *Laaman v. Helgemoe,* 437 F.Supp. 269, 319 (D.N.H. 1977). While prison officials are not insurers of inmate safety, the Eighth Amendment forbids an environment in which prison officials have lost control. *Palmigiano v. Garrahy,* 443 F.Supp. 956, 980 (D.R.I.1977), *aff'd,* 616 F.2d 598 (1st Cir.), *cert. denied,* 449 U.S. 839, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980). The constitutional obligation of prison officials to protect inmates from abuse and violence requires no more, however, than that the officials "exercise reasonable care to provide reasonable protection from ... unreasonable risk of harm." *Withers v. Levine, supra,* 615 F.2d at 162.

■ In the present case, defendants appear to have acknowledged that prior to the April 1980 lockdown MSP did not provide inmates with adequate protection from violence.[11] But the record does not support plaintiffs' claim that violence among the general population inmates since the lockdown has continued to be "excessive and unreasonable." Plaintiffs have cited to the Court only three specific incidents of violence alleged to have occurred since the lockdown.[12] The Court takes judicial notice that many violent incidents in a prison such as MSP go unreported. *See Palmigiano v. Garrahy, supra,* 443 F.Supp. at 967–68. Nevertheless, "occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment." *Woodhous v. Commonwealth of Virginia, supra,* 487 F.2d at 890 (citing *Penn v. Oliver,* 351 F.Supp. 1292 (E.D.Va.1972)); *Withers v. Levine, supra,* 615 F.2d at 161; *Pugh v. Locke,* 406 F.Supp. 318, 329 (M.D.Ala. 1976), *aff'd with modifications sub nom. Newman v. Alabama,* 559 F.2d 283 (5th Cir.1977), *rev'd in part on other grounds sub nom. Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). The number of violent incidents at MSP disclosed by the present record is in no way comparable to the number revealed to have occurred in the Rhode Island, Alabama, Arkansas, and Texas penal institutions in *Palmigiano v. Garrahy, supra,* 443 F.Supp. at 966–68, *Pugh v. Locke, supra,* 406 F.Supp. at 324–25; *Holt v. Sarver,* 309 F.Supp. 362, 376–78 (E.D.Ark.1970), *aff'd and remanded,* 442 F.2d 304 (8th Cir.1971), and *Ruiz v. Estelle,* 503 F.Supp. 1265, 1281–82 (S.D.Tex. 1980), *aff'd in relevant part,* 679 F.2d 1115 (5th Cir.1982).

Not only does the record fail to support plaintiffs' allegation that the current level of violence at MSP is unreasonably high, but the evidence does not establish that the present level of staffing and the revised classification system at the prison are inadequate for the effective control of the inmates. The 136 security officers at the prison in June 1981 were supplemented by 13 additional security guard positions in July 1982. All security officers receive 80

11. Indeed, the evidence discloses that the April 1980 lockdown resulted directly from the recommendations of two technical assistance teams which toured the prison in December 1979 and March 1980 and found that the staff had lost control of the institution. Both the then Commissioner of the Department of Mental Health and Corrections and the then Director of the Bureau of Corrections concurred at the time in the findings of the technical assistance teams.

12. The Court is unable to accept as indicative of the *current* level of violence at MSP the projections made by plaintiffs' counsel based upon their review of selected MSP disciplinary reports during the years 1978, 1979 and the first eight months of 1980, which reflect for the most part conditions *prior to* the April 1980 lockdown. Moreover, the record contains no supporting testimony attesting to the validity of the techniques employed.

hours of basic entry level training, 80 hours of training at the Maine Criminal Justice Academy, and further in-service training at MSP under the direction of the Training Coordinator.[13] There is no persuasive evidence that the officers are inadequately trained or that 149 security officers are not sufficient for a prison population of approximately 400. Defendants acknowledge the staffing difficulties in maintaining inmate safety at MSP, particularly in the East Block because of its interior design. Plaintiffs' evidence, however, mainly consisting of opinions of experts as to *desirable* prison conditions, does not support the conclusion that inmates are not reasonably safe at MSP. *See post* at 689.

The evidence also fails to support plaintiffs' charge that the current classification system at MSP has exacerbated the incidence of violence by failing to separate violent from nonviolent inmates. Plaintiffs recognize that the classification procedures set forth in the new manual, while not perfect, are "a salutary change." Moreover, although plaintiffs' expert testified that he preferred a more objective approach to classification, he acknowledged that the new classification system is "an effort in an excellent direction." The Court is not persuaded that the revised classification system at MSP is constitutionally flawed.

■ Being aware of the Supreme Court's admonition that courts must proceed cautiously in making Eighth Amendment judgments concerning prison security measures, *Rhodes, supra,* 452 U.S. at 351, 101 S.Ct. at 2401, this Court cannot say that the existing security arrangements at MSP do not meet *constitutional* requirements. As the Supreme Court has observed, security considerations "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their

response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Bell v. Wolfish, supra,* 441 U.S. at 540–41 n. 23, 99 S.Ct. at 1874–1875 n. 23 (quoting *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974)); *Rhodes, supra,* 452 U.S. at 349 n. 14, 101 S.Ct. at 2400 n. 14; *Morris v. Travisono,* 707 F.2d 28 (1st Cir. 1983).

b. *Living and working conditions.* Plaintiffs' second claim is that living and working conditions at MSP, particularly in the East Block, do not provide reasonable shelter, sanitation and safety, and are beneath minimum standards of decency. They allege that cells do not provide an adequate amount of living space; that sanitation, lighting and ventilation are substandard; that noise levels are excessive; and that fire safety and industrial hygiene are seriously deficient.

■ It is undisputed that when a State incarcerates a convicted criminal, it must assure that the living conditions provided are not so inhumane as to fall below "the contemporary standard of decency" or to deny inmates "the minimal civilized measure of life's necessities." *Rhodes, supra,* 452 U.S. at 347, 101 S.Ct. at 2399; *Jackson v. Meachum, supra,* 699 F.2d at 582. On the other hand, "the Constitution does not mandate comfortable prisons, and prisons . . ., which house persons convicted of serious crimes, cannot be free of discomfort." *Rhodes, supra* 452 U.S. at 349, 101 S.Ct. at 2400.

■ The conditions of confinement at MSP are unpleasant, if not harsh. Prior to the April 1980 lockdown, living conditions at the prison may well have been below minimum standards.[14] Nevertheless, the evidence in this case does not support the conclusion that the current living and working conditions at MSP fail to meet the requirements of the Eighth Amendment.

---

**13.** By State law, all security personnel must receive 20 hours per year of in-service training. 25 M.R.S.A. 2805(3).

**14.** In 1980, the then Director of the Bureau of Corrections described the prison prior to the

lockdown as "falling apart," in that the roofs were leaking, showers were substandard, and the institution was "just generally filthy and decrepit."

Since the institution of this litigation, defendants have effected substantial improvements in the living conditions of inmates at MSP. Plaintiffs now agree on the adequacy of food service, clothing, medical care, mental health services and visitation opportunities at the prison. Despite the opinions of plaintiffs' experts as to *desirable* cell size, there is no evidence that the single occupancy, 42-square foot cells in which inmates are confined so offend contemporary standards of decency as to be beneath *constitutional* minima. *Cf. Rhodes v. Chapman, supra,* 452 U.S. at 348–49 and nn. 13, 14, 101 S.Ct. at 2400 and nn. 13, 14. Furthermore, the evidence presented at the most recent 1981 evidentiary hearings, which was confirmed by the Court's observations during its November 1982 tour of the prison, discloses that defendants have done much to remedy the sanitation, lighting and ventilation deficiencies of which plaintiffs have complained, and that at the present time, reasonably adequate shelter, sanitation and lighting are being provided the inmates in the general population at MSP.

Defendants have established preventive maintenance and cleaning programs which should be effective in maintaining a healthful and sanitary environment. Each area of the prison is now inspected daily, and written reports are submitted. In addition, MSP is inspected annually by State Department of Human Services health engineers using State-established standards. The Supervisor of the Division of Health Engineering, Bureau of Health, Maine Department of Human Services, testified that during recent inspections no sanitation deficiencies had been found in the kitchen and dining areas which "posed a threat to the health of inmates"; that there have been no violations at MSP of the State Plumbing Code except for the hooking of hoses to faucets without anti-syphoning devices; that the shower and laundry areas have been cleaned and are now sanitary; that there is no evidence of insect, rodent, or other pest infestation at the prison; and that, in terms of sanitation, the living quarters throughout the institution are "in a good healthy condition to live in."

Defendants are also taking steps to improve the lighting and to increase the flow of air in the cells, and a Stratotherm system and Casablanca-type fans have been installed in the East block to equalize temperature variations between the upper and lower tiers. During the Court's recent view, sanitation, lighting, ventilation and the general level of noise in the residential areas of MSP each appeared to be at acceptable levels.

The evidence also does not support plaintiffs' charge that fire safety at MSP currently is inadequate. The State Fire Marshal's office inspects the prison on a regular basis. The Fire Marshal testified that defendants have consistently complied with his requests to correct noted deficiencies. At his most recent inspection he was "amazed" at the extent to which potential fire hazards had been eliminated. Under the aegis of the Fire Marshal's office, excessive fuel loads in the cell blocks and industrial areas have been eliminated, a fire evacuation plan has been developed, quarterly fire drills are held, a second means of egress for each corridor in the East Block was completed in March 1982, and plans are being prepared for the installation of smoke venting and detection systems, the lack of which was of concern to the Fire Marshal. In the opinion of the Fire Marshal, the residential units at MSP are now "far, far safer than they ever were" and the threat to inmates in terms of fire safety in the living and industrial areas at the prison is "very, very minimal."

Defendants have also taken steps to safeguard the health and safety of inmates in the prison shops. A Safety Committee has been established which has developed safety rules for the industries, crafts, and laundry areas, and a five-day safety and occupational training program has been implemented for staff and inmates in the work program. Dust masks, protective goggles and ear protectors are available for inmates working in the various shops, and recent inspections have shown MSP to be in reasonable com-

pliance with OSHA standards. The Director of the Industrial Safety Division, Maine Bureau of Labor, testified that defendants' response to noted deficiencies has been "extremely good"; that his most recent inspection revealed no major housekeeping problems; and that the safety equipment in the shops is "very comparable" to that found in private industry. In his opinion, the industrial areas at MSP are "a safe environment in which to work."

■ The Court has considered the views of expert witnesses presented by plaintiffs who have testified that many of the conditions at MSP still do not meet minimum penological standards. But, as the Supreme Court has observed, the opinions of experts as to desirable prison conditions "may be helpful and relevant with respect to some questions, but 'they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question.'" *Rhodes, supra,* 452 U.S. at 348 n. 13, 101 S.Ct. at 2400 n. 13 (quoting *Bell v. Wolfish, supra,* 441 U.S. at 543–44 n. 27, 99 S.Ct. at 1876 n. 27).

MSP is an antiquated facility which is hardly a credit to the State of Maine. Nevertheless, the basic human needs of the inmates—reasonably adequate shelter, sanitation, food, clothing, personal safety, and medical care—are being met. The Eighth Amendment requires no more. *Ramos v. Lamm,* 639 F.2d 559, 566–67 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Newman v. Alabama,* 559 F.2d 283, 291 (5th Cir.1977), *rev'd in part on other grounds sub nom. Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978).

■ c. *Idleness.* Plaintiffs' third and final claim is that the lack of meaningful work, and vocational, educational and recreational offerings at MSP results in widespread and destructive idleness among the inmates. They point out that only approximately 25% of the inmates are assigned work in the four industries areas; that no vocational training is provided within the walls of the prison; that at the time of trial, only 10 or 12 inmates participated in any of the available educational offerings; and that the indoor and outdoor recreational facilities are unattractive and inadequate for the number of inmates they must serve.

■ Defendants properly appear to acknowledge that program deficiencies have existed at MSP for many years and that there is lacking at the prison the rehabilitative facilities and services which many, more modern, institutions now offer. But the courts have not recognized a constitutional right to rehabilitation for prisoners. *See, e.g., Fiallo v. de Batista,* 666 F.2d 729, 730 (1st Cir.1981); *Newman v. Alabama, supra,* 559 F.2d at 291. More specifically, as the Supreme Court most recently declared in *Rhodes,* deprivations of job and educational opportunities to prisoners do not violate the Constitution; the denials of such opportunities "do not inflict pain, much less unnecessary and wanton pain; deprivations of this kind simply are not punishments." 452 U.S. at 348, 101 S.Ct. at 2400. If, as this Court has concluded, the State of Maine is furnishing the inmates reasonably adequate food, clothing, shelter, sanitation, personal safety, and medical care, its obligations under the Eighth Amendment have been met. *See, e.g., Madyun v. Thompson,* 657 F.2d 868, 874 (7th Cir.1981); *Ramos v. Lamm, supra,* 639 F.2d at 566–67; *Newman v. Alabama, supra,* 559 F.2d at 291.

\*    \*    \*    \*    \*    \*

In rejecting the Eighth Amendment claims of the general population inmates, the Court in no way lauds or even approves of the conditions at MSP. As noted above, defendants have improved the conditions at the prison only under the very real threat of this lawsuit and only to the minimum extent mandated by the Eighth Amendment. The Court is troubled that defendants have failed to make a number of significant improvements at the prison which could be accomplished at minimal cost. The installation of surveillance cameras could easily eliminate the danger of assault posed by "blind spots" in the East Block. A manual system for opening cell doors simultaneously could very conceivably save lives in

the event of a cell block fire. More enlightened programming could do much to alleviate the tedium of the inmates' lives. That improvements such as these have not been made at MSP can hardly be a source of pride for these defendants.

### B. Protective Custody Plaintiffs (Civil No. 79–8 P)

The Protective Custody plaintiffs allege that defendants have subjected them to cruel and unusual punishment in violation of the Eighth Amendment, and also that defendants have arbitrarily denied them programs and facilities available to the general population at MSP in violation of the Equal Protection Clause of the Fourteenth Amendment. The Court will deal separately with each of these claims.

#### 1. The Eighth Amendment Claims

Plaintiffs contend that their Eighth Amendment right not to be subjected to cruel and unusual punishment has been violated because they are unnecessarily exposed to violence or the threat of violence from general population inmates and because the environment in which they are confined is excessively punitive. The Court has concluded on this record, however, that, although more stringent than those of general population inmates, the current conditions in which Protective Custody inmates are confined at MSP, considered alone or in combination, do not violate the Eighth Amendment in either respect alleged by plaintiffs.

a. *Violence and the Threat of Violence.* Central to plaintiffs' claim that they are unreasonably exposed to violence or the threat of violence from general population inmates is defendants' amendment of the criteria for Protective Custody status implemented in November 1980. Prior to November 1980, Protective Custody status, while discouraged, was available to inmates upon request. The Protective Custody population at the prison ranged from 35 to 63. The new criteria require some corroboration of the basis for an inmate's fear for his safety prior to his placement in Protective

Custody. As a result, the number of inmates in Protective Custody at the time of the June 1981 hearing had been reduced to 24 and in June 1982 was only 28.

▮ Plaintiffs contend that self-referral to Protective Custody is essential to ensure that inmates are protected from violence. They point to the testimony of three inmates that when they were involuntarily returned to the general population, they were subject to assault by other inmates. But defendants dispute this testimony, and the evidence is unclear as to the circumstances surrounding the incidents in question. In any event, the Court is satisfied that the more stringent Protective Custody criteria now in place at MSP are not, as plaintiffs contend, so "unreasonable, arbitrary and capricious" as to violate the inmates' Eighth Amendment rights. Contrary to plaintiffs' charges, defendants do not require staff witnessing of threats; evidence from "confirmed reliable sources" that an inmate has been subjected to threats, abuse, or harassment suffices for placement in Protective Custody. Plaintiffs' own expert acknowledged that there is not unanimity among correctional authorities as to whether Protective Custody placement should be granted on demand. Defendants have shown that administrative and fiscal considerations furnish a rational basis for the requirement of corroboration. *See Nadeau v. Helgemoe, supra,* 561 F.2d at 419. Because of the heavy administrative and fiscal burdens which the maintenance of special Protective Custody housing places on prison officials, the State has a legitimate interest in providing special housing only to those inmates who require it. *Id.* The requirement that a prisoner be entitled to Protective Custody status only in accordance with verified criteria is reasonably designed to prevent abuse of the system and to ensure that the status is reserved for those who genuinely need protection.

▮ The Protective Custody plaintiffs also argue that the areas in which they are confined are not reasonably secure and that they are constantly in fear of general population access to their units. There is no

evidence, however, that any Protective Custody inmate has been seriously threatened, assaulted or injured while physically in a Protective Custody unit or at outside exercise in the bullpen, in the visiting room, or in the infirmary. Protective Custody inmates are now housed in Cell Dormitories 5 and 6 in the West Block and in Open Dormitory 4 in the New Building. They are no longer housed in the Center or East Blocks. All three dormitories are well segregated, secured by locked steel doors, and adequately staffed by security officers. A guard escort is provided for an inmate traveling to and from the bullpen, the visiting room, or the infirmary. There has been no substantial evidence offered to support the claim that, while confined in Protective Custody, the inmates' safety is unreasonably jeopardized.

To summarize, plaintiffs have not shown that the revised criteria for Protective Custody status or the current security afforded Protective Custody inmates at MSP unreasonably exposes them to violence or the threat of violence.

b. *Environmental Conditions.* The remaining Eighth Amendment claim of the Protective Custody plaintiffs concerns the environment in which they live. They make no complaint concerning Dormitory 4, but they contend that because of insufficient ventilation, light and temperature control, Dormitories 5 and 6, which are located below ground, fall below contemporary standards of decency. They also argue that because of their limited access to prison programs and activities, the resulting enforced idleness rises to constitutional dimensions.[15]

▮ Plaintiffs' claim that the current conditions in Dormitories 5 and 6 fail to meet the requirements of the Eighth Amendment is not sufficiently buttressed by the evidence before the Court. The inmates in these dormitories live in single occupancy cells which open on a dayroom

area. When the Court most recently toured the prison, the areas were clean and well maintained. State health officials have inspected the dormitories and have found no significant unsanitary conditions. Since the commencement of these actions, the areas have been scraped and painted, a new ceiling has been installed in the corridor outside both dormitories, the hot water pipes and tank, which formerly radiated excessive heat in Dormitory 5, have been insulated, and the lighting in both dormitories has been upgraded. These improvements have substantially alleviated the uncomfortable conditions to which inmates housed in these dormitories were subjected in the past. The Court is satisfied that the current condition of the three dormitories in which Protective Custody inmates are confined does not fall beneath constitutional minima.

▮ With respect to the Protective Custody plaintiffs' claim that their limited access to prison programs and activities violates their Eighth Amendment rights, idleness is indeed more pervasive for these inmates than for inmates in the general population. As the Court of Appeals has observed the life of a Protective Custody inmate "is, for the most part, boring and filled with inconvenience." *Nadeau v. Helgemoe, supra,* 561 F.2d at 412. Limited access to prison programs is, however, a necessary incident of plaintiffs' Protective Custody status. *Id.* And although it is evident that defendants, at minimal cost and without endangering the safety of these inmates, could take further steps to alleviate the tedium of their confinement by providing more extensive job, educational and recreational opportunities, the Supreme Court has made clear that the failure of defendants to implement these programs does not rise to the level of a constitutional violation. *Rhodes, supra,* 452 U.S. at 348, 101 S.Ct. at 2400.

---

**15.** Since the institution of this litigation, defendants have effected substantial improvements in the living conditions of the Protective Custody inmates at MSP. These plaintiffs now agree on the adequacy of the food service, clothing, medical care, mental health services and visitation opportunities available to them.

## 2. The Equal Protection Claim

The Protective Custody plaintiffs allege that defendants have violated their Fourteenth Amendment right to equal protection by arbitrarily depriving them of programs and facilities available to general population inmates. As plaintiffs concede, however, the Constitution does not require that Protective Custody and general population inmates be treated identically. While the differences in treatment between Protective Custody prisoners and the general population may not be arbitrary and capricious, the Constitution is satisfied when the differences in treatment are rational. *Nadeau v. Helgemoe, supra*, 561 F.2d at 416. Moreover, administrative convenience and expense are properly considered by a court in determining the constitutional validity of prison policy; the Fourteenth Amendment does not require equal treatment of Protective Custody and general population inmates regardless of cost, so long as the distinction drawn is rationally based. *Id.* at 417.

In the instant case, it is undisputed that the job, educational and recreational opportunities afforded general population inmates at MSP are more extensive than those available to Protective Custody inmates. Plaintiffs, however, have not presented any substantial evidence to show that the differences in treatment are not reasonably related to the limitations resulting from the nature of their confinement in high security, segregated units for their own protection. On the present record, the Court cannot say that the differences in treatment which presently exist between Protective Custody and general population inmates at MSP are arbitrary and capricious, or otherwise violate plaintiffs' equal protection rights.

## C. Administrative Segregation Plaintiffs (Civil No. 78–90 P)

The Administrative Segregation plaintiffs present two claims. They allege that the conditions of their confinement amount to cruel and unusual punishment, violative of the Eighth Amendment. They also charge that the procedures followed by defendants in assigning inmates to Administrative Segregation status violate their rights under the Fourteenth Amendment Due Process Clause and the provisions of this Court's 1973 Consent Decree, as amended. The Court treats separately each of these claims.

### 1. The Eighth Amendment Claims

Plaintiffs contend that the conditions of their confinement are so below civilized norms as to constitute cruel and unusual punishment. Specifically, they complain that insufficient space, ventilation, light and temperature control in the Segregation Unit, the lack of meaningful exercise, the denial of communal activity, and insufficient medical and psychological care violate their Eighth Amendment rights. The Court has concluded on the basis of the evidence presented at the 1981 hearings and of the Court's most recent view that although the current conditions of administrative confinement at MSP are still extremely unpleasant, they do not rise to the level of an Eighth Amendment violation.

Throughout the five years since the initiation of this litigation, the record discloses that defendants have substantially ameliorated the rigorous conditions in which Administrative Segregation inmates have been confined at MSP. Administrative Segregation inmates are no longer confined on the North or Plank side of the Administrative Segregation Unit. They are now housed on the South side in single occupancy cells, the North and Plank side cells being reserved for disciplinary cases. Only those Administrative Segregation inmates who disturb other inmates or who so request may be moved to North or Plank side. At the time of the June 1981 hearing only five inmates were being held in Administrative Segregation, a substantial reduction from the 25 inmates in Administrative Segregation during the 1979–80 hearings. The South side consists of 11 cells opening onto a corridor approximately 12 feet wide, which runs the length of the cell block. Each cell is of the

same size (approximately 6 feet by 8 feet), and has the same furnishings as the general population cells. All the cells have double doors with a foyer between the doors. The inner door has bars. The outer door is solid metal except for a window approximately 4 inches by 6 inches covered by a flap. The outer door is now normally kept open, allowing light and air to enter the cell. Sanitation in the Unit appears to be adequate. The inmates are now permitted to have personal clothing, shoes and effects in their cells. The South side contains a shower, and a washer has been placed in the Segregation Unit. Although the cells do not have hot running water, the guards bring hot water to the inmates on request. The area is adequately heated, ventilated and maintained by the prison maintenance staff. Televisions and radios can be installed in the South side cells. The inmates clean their own cells with materials furnished by the guards.

The Administrative Segregation inmates are permitted one hour of exercise per day in the corridor adjacent to their cells; on three days each week they are permitted outside exercise in the bullpen. They receive the same food as other inmates, which is brought from the dining area by inmate runners accompanied by guards and served in the inmates' cells by the guards. The inmates may order items from the prison commissary. They are permitted one personal telephone call each week and may telephone their attorneys at any time it is necessary. The inmate advocate visits the Unit weekly to take requests for books, including law books. The prison chaplains or a priest visit the inmates upon request. The inmates have the same visiting privileges as general population inmates and are eligible to apply for furloughs. They have the same mail service as other inmates.

■■ Plaintiffs complain that their medical, dental, and psychological needs are ignored. But there is no credible evidence in the record that defendants have neglected the serious medical, dental or psychological problems of Administrative Segregation inmates. *See Estelle v. Gamble, supra,* 429 U.S. at 101–06, 97 S.Ct. at 289–292. A nurse visits the Segregation Unit at least three times daily, and, when necessary, the prison doctor also visits the Unit. For the more serious ailments, inmates may obtain a pass to see the prison doctor or dentist at the infirmary. Psychiatric and psychological care are provided by the prison psychiatrist, psychologists and social workers, assisted by inmates in the psychological-associate program.

■■ Plaintiffs complain that they are unreasonably deprived of privileges, facilities and activities available to the general prison population. But the limited access of these plaintiffs to prison programs and activities is a necessary incident of segregated confinement. Moreover, the deprivation of these opportunities is not of constitutional dimensions. *Rhodes, supra,* 452 U.S. at 348, 101 S.Ct. at 2400.

■■ Finally, plaintiffs complain that they are confined to their cells 23 hours a day and that during the one hour permitted outside their cells they are required to exercise alone or with but one other inmate. The courts have consistently held, however, that solitary confinement, in and of itself, is not cruel and unusual punishment. *Jackson v. Meachum, supra,* 699 F.2d at 582; *Hawkins v. Hall,* 644 F.2d 914, 917 (1st Cir.1981); *O'Brien v. Moriarty,* 489 F.2d 941, 944 (1st Cir.1974). " 'Segregated confinement involving neither intolerable isolation nor inadequate food, heat, sanitation, lighting or bedding, does not fall within the ... category' of conduct so below civilized norms as to be cruel and unusual punishment no matter what its provocation." *Jackson v. Meachum, supra,* 699 F.2d at 582 (quoting *O'Brien v. Moriarty, supra,* 489 F.2d at 944).

The conditions in which Administrative Segregation inmates are confined at MSP are harsh, but they are not so barbaric or shocking as to constitute cruel and unusual punishment, violative of the Eighth Amendment. Defendants currently furnish these inmates with reasonably adequate food, clothing, shelter, sanitation and medical care. The requirements of the Eighth Amendment are met. *Jackson v. Meachum,*

*supra; Hawkins v. Hall, supra; O'Brien v. Moriarty, supra; see also Gibson v. Lynch,* 652 F.2d 348, 352–53 (3d Cir.1981); *Bono v. Saxbe,* 620 F.2d 609, 614 (7th Cir.1980); *Newman v. Alabama, supra,* 559 F.2d at 291.

### 2. The Due Process and Consent Decree Claims

Plaintiffs contend that the procedures followed by defendants in confining inmates to Administrative Segregation have violated their rights under both this Court's 1973 Consent Decree, as amended, and the Due Process Clause of the Fourteenth Amendment. Because the evidence establishes that defendants have flagrantly ignored the requirements of the amended Consent Decree, the Court need not reach plaintiffs' Fourteenth Amendment Due Process claim. *See Hewitt v. Helms,* —— U.S. ——, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Parker v. Cook,* 642 F.2d 865 (5th Cir.1981).

Exhibit B annexed to the amended Consent Decree sets forth the regulations governing placement in Administrative Segregation at MSP. These regulations make clear that Administrative Segregation is not a disciplinary measure. They provide that an inmate may be placed in Administrative Segregation only at his own request or when "there exists a high likelihood that the inmate's residence in less restrictive areas would constitute an escape risk, a clear and present danger to the security of the prison or a substantial threat to the physical safety of the inmate or of others." "Except when an inmate is placed in administrative segregation at his own request, and except when an emergency requires immediate administrative segregation of an inmate," the following procedural protections are mandated: (1) written notice, a reasonable time prior to hearing, of the proposed placement and the reasons therefor; (2) an impartial "due process hearing" before an impartial Administrative Segregation Panel, at which the inmate has the right to be present, to be assisted by a counsel substitute, to present evidence on his own behalf, to call witnesses, and to question any witness who testifies at the hearing; (3) a written summary of the evidence presented at the hearing, the findings and decision of the panel and the basis thereof, and the conditions to be met to qualify for release from segregation; and (4) the right within three working days to an appeal and review of the panel decision by the prison warden. The regulations permit the emergency placement of an inmate in Administrative Segregation, without the foregoing procedural protections, only upon the order of an officer of the rank of sergeant or above "when there exists a clear and present danger that the security of the prison or the safety of the inmate or of others will be threatened unless such action is taken." In the event of an emergency commitment, the inmate must be given notice and a hearing on the next regular business day. Finally, the regulations require biweekly reviews of the inmate's status by the Administrative Segregation Panel and, if the inmate is confined longer than 30 days, notice of the reasons for his continued confinement and a due process hearing.

█ The Court's review of the record makes clear that defendants have consistently ignored the foregoing requirements. The evidence shows that inmates are arbitrarily placed in Administrative Segregation for reasons unrelated to the risk of escape, prison security or a threat to the safety of the inmate or others. Inmates have been confined in Administrative Segregation for refusing to work, for refusing to leave Protective Custody, and for minor acts of misbehavior which are properly the subject of the disciplinary rules. In addition, it is apparent that defendants have allowed emergency placement in Administrative Segregation, without providing inmates the procedural safeguards required by the regulations, to become the norm at MSP. Almost without exception, inmates have been placed in Administrative Segregation by guards without a hearing. The practice has resulted, in the more egregious cases, in some inmates being denied a hearing for many days and even weeks. Moreover, the "due process hearings" ultimately

provided to inmates are conducted in a manner blatantly in violation of the regulations. Notices of hearings lack sufficient detail to inform the inmate of the charges against him, and are frequently given just prior to the hearing. Many hearings are held in the foyer outside the bars of an inmate's cell, and last only a few minutes. The counsel substitute usually is provided insufficient time to confer with the inmate and to prepare a defense. The inmate is frequently not permitted to face his guard accuser and is provided no opportunity to call witnesses. In short, the so-called "due process hearing" has become a sham.

The inescapable conclusion on this record is that the procedures being used by defendants to place inmates in Administrative Segregation at MSP deny inmates the procedural protections mandated by the Consent Decree. Plaintiffs are entitled to the declaratory and injunctive relief they seek: a judgment declaring that the procedures being followed by defendants in assigning inmates at MSP to Administrative Segregation violate the provisions of this Court's 1973 Consent Decree, as amended, and an injunction restraining defendants from continuing to violate the procedural requirements of that decree.

### III.

#### The Restraint Cells

Plaintiffs contend that the three Restraint cells (known by inmates as the "hole") in the Administrative Segregation Unit are not fit for human habitation and that their use by defendants is constitutionally impermissible. The Court agrees that the condition and use of these cells is so inhumane as to violate Eighth Amendment standards.

The three Restraint cells are located on a separate corridor in the Administrative Segregation Unit. They are totally unfurnished. Each cell has three bare concrete walls and a concrete floor. The front of the cell is steel bars. Beyond the bars is a small vestibule and a solid steel door broken only by a small opening covered by a metal flap. There are no windows in these cells. The only light is outside each cell in the vestibule area and cannot be controlled by the occupant. A hole in the concrete floor (known as a "Chinese toilet") serves as a toilet and can only be flushed from outside the cell. There is no heat in the cells, and ventilation is virtually nonexistent. Inmates are placed in the cells naked. They are often not provided with bedding or basic hygienic materials. The evidence discloses that the duration of confinement in these cells has ranged from several hours to several days. The conditions of confinement were vividly described by an inmate witness as follows:

[T]here's a hole in the floor and you have to use that as a toilet. There is no provisions (sic) for washing of hands after using that. There's no running water, no nothing. You have to eat in proximity. It is usually encrusted with urine and excrement. Very rarely is it clean. If the cell is dark, the man has to urinate trying to urinate in the hole and this is very difficult, so usually it splatters on the floor and you are walking around in it and then, when you sleep, you have to lie in this because you have tracked it all over.

Defendants contend that the Restraint cells are only used to house suicidal and uncontrollable inmates and that they are a necessary prison management tool. As such, defendants say, they are not necessarily unconstitutional. *See Hutto v. Finney, supra,* 437 U.S. at 685–87, 98 S.Ct. at 2570–2571; *O'Brien v. Moriarty, supra,* 489 F.2d at 944; *Finney v. Hutto,* 410 F.Supp. 251, 275 (E.D.Ark.1976), *aff'd,* 548 F.2d 740 (8th Cir.1977), *aff'd,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). They point out that plaintiffs' expert witnesses acknowledged that Restraint cells are a necessary management tool. Conditions such as those disclosed by the record in the instant case have been vehemently condemned by the courts, however, as so barbaric and uncivilized as to transgress the Eighth Amendment ban on cruel and unusual punishment. *E.g., LaReau v. MacDougall,* 473 F.2d 974, 978 (2d

Cir.1972), *cert. denied,* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973); *Wright v. McMann,* 387 F.2d 519, 525 (2d Cir.1967); *Aikens v. Lash,* 371 F.Supp. 482, 496–98 (N.D.Ind.1974), *aff'd with modifications and remanded,* 514 F.2d 55 (7th Cir.1975), *vacated and remanded on other grounds,* 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191 (1976); *Knuckles v. Prasse,* 302 F.Supp. 1036, 1061–62 (E.D.Pa.1969), *aff'd,* 435 F.2d 1255 (3d Cir.1970), *cert. denied,* 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971); *Jordan v. Fitzharris,* 257 F.Supp. 674 (N.D.Cal.1966).

In the instant case, the evidence is overwhelming that the manner in which defendants have used the Restraint cells for confinement of disruptive inmates at MSP has been so inhumane and so violative of minimal concepts of decency as to violate the Eighth Amendment. Plaintiffs are entitled to a judgment declaring that the use of the Restraint cells by defendants violates the Eighth and Fourteenth Amendments, and an injunction prohibiting their continued use.[16]

### IV.

### *The Access to the Courts Claim*

The Administrative Segregation and Protective Custody inmates allege that their Sixth Amendment right of access to the courts is being infringed because of the restriction on library use imposed upon them by defendants. Both classes of inmates are not permitted to visit the prison library. The inmate advocate, who visits each group weekly, or a guard brings books to an inmate when requested, but only one book is brought at a time.[17]

The Supreme Court has recently considered the problem of state prisoners' access to law libraries. *Bounds v. Smith,*

430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). There the Court held

that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries *or adequate assistance from persons trained in the law.*

*Id.* at 828, 97 S.Ct. at 1498 (emphasis supplied). In *Bounds,* the Supreme Court thus made clear that an inmate's constitutional right of meaningful access to the courts is met if the state provides *either* an adequate law library *or* adequate legal assistance. In fact, the Court emphasized that an adequate law library is only one constitutionally acceptable method of meeting the state's obligation; inmate paralegal assistants, law students, volunteer and staff attorneys were suggested as alternative methods for assuring prisoners access to the courts; and states were encouraged to experiment. *Id.* at 830–32, 97 S.Ct. at 1499–1500. Finally, the Court noted that in assessing the constitutional sufficiency of a state plan, the plan must be "evaluated as a whole." *Id.* at 832, 97 S.Ct. at 1501; *see also Nadeau v. Helgemoe, supra,* 561 F.2d at 417–18.

The Court is satisfied on the present record that the legal assistance available to these plaintiffs at MSP is adequate to secure their right of meaningful access to the courts. Maine provides for the appointment of counsel for indigent criminal defendants during trial and on direct appeal from a judgment of conviction. *See* Me.R. Crim.P. 44. Maine also provides counsel for indigent prisoners seeking post-conviction review of criminal proceedings. *See* 15 M.R.S.A. § 2129(1)(B) (Supp.1982); Me.R. Crim.P. 69. Additionally, the court may appoint counsel for an indigent prisoner

**16.** The Court is aware of and has reviewed the policy statement concerning the use of Restraint cells promulgated by the prison warden on May 5, 1981, shortly prior to the presentation of defendants' evidence at the June 1981 hearing. The extent to which implementation of this policy may satisfy minimal constitutional requirements, is a matter which can be considered by the Court, after hearing the parties,

in fashioning the relief to which plaintiffs are entitled.

**17.** In addition, Administrative Segregation inmates have direct access to Title 17A of the Maine Revised Statutes (the Maine Criminal Code) and a two-volume prisoner rights handbook, which are kept in the Segregation Unit for their use.

seeking relief under the civil rights statutes. *See* 28 U.S.C. § 1915(d). Segregated inmates also receive paralegal services from the inmate advocate, who visits their units weekly and has the adequate resources of the MSP library at his disposal. The Office of Advocacy assists these inmates in obtaining legal materials and in referrals for legal assistance. *See* 34 M.R.S.A. § 1–A. Finally, the Department of Corrections has recently created a full-time advocate position at the prison to furnish legal assistance to segregated inmates. In sum, the facilities and services provided at MSP to Protective Custody and Administrative Segregation inmates, evaluated as a whole, afford them their constitutionally guaranteed right of meaningful access to the courts, as required by *Bounds. Cf. Rich v. Zitnay,* Civ. No. 79–222 P (D.Me. Dec. 29, 1982); *Carter v. Kamka,* 515 F.Supp. 825 (D.Md. 1980); *Hohman v. Hogan,* 458 F.Supp. 669 (D.Vt.1978).[18]

## V.

### State Law Claims

■■■ All three classes of plaintiffs raise pendent State law claims, charging that defendants have violated various provisions of the Maine Constitution and statutes. *See* Me.Const. art. I, §§ 6 and 9; 34 M.R.S.A. §§ 4, 5, 7, 527, 531 and 532; 17A M.R.S.A. § 1253(4). Given the dearth of State court authority interpreting these constitutional and statutory provisions, the awkwardness of projecting the interpretation of State law by the State's highest court, the deference due State courts on questions of State law as a matter of comity, and plaintiffs' tepid assertion of these claims in this case, the Court declines to reach the State law claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86

S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right."); *Piper v. Supreme Court of New Hampshire,* 708 F.2d 825, 833 (1st Cir.1983).

## VI.

### Order

Pursuant to the foregoing:

(1) A judgment will be entered forthwith dismissing all claims asserted by plaintiffs in these consolidated actions except

(a) the claim of the Administrative Segregation plaintiffs that the procedures followed by defendants in assigning inmates to Administrative Segregation status at the Maine State Prison violate plaintiffs' rights under the provisions of the Consent Decree entered by this Court on January 4, 1973 in *Inmates v. Mullaney,* Civil No. 11–187, as amended by judgment entered September 27, 1977 and clarified by order entered May 10, 1978;

(b) Plaintiffs' claim that the condition and use by defendants of the three Restraint cells in the Administrative Segregation Unit of the Maine State Prison violate the Eighth and Fourteenth Amendments of the United States Constitution;

(2) A judgment will be entered forthwith declaring that the procedures followed by defendants in assigning inmates to Administrative Segregation status at the Maine State Prison violate the provisions of the 1973 Consent Decree, as amended, and permanently enjoining defendants from further violating the provisions of the 1973 Consent Decree, as amended;

---

**18.** In affirming the district court's conclusion that Protective Custody inmates had been denied access to the prison law library unconstitutionally, the Court of Appeals in *Nadeau, supra,* noted "it would cost New Hampshire little or nothing to give PC inmates greater freedom to use its library, which is down three or four flights of stairs from the PC cells." *Nadeau, supra,* 561 F.2d at 418. The instant case is distinguishable because, putting aside the adequate legal assistance provided segregated inmates at MSP, plaintiffs have not shown that defendants could resolve "at little or no cost to the state," *id.,* the problems of security, longer library hours, library staffing, and guard escorts raised by allowing both Protective Custody and Administrative Segregation inmates to use the MSP library located in another building and accessible only via the general population.

(3) A judgment will be entered forthwith declaring that the condition and use by defendants of the three Restraint cells in the Administrative Segregation Unit of the Maine State Prison violate the Eighth and Fourteenth Amendments of the United States Constitution and permanently enjoining defendants from the further use of the Restraint cells.

IT IS SO ORDERED.